**STANDARD FITTINGS COMPANY,
Plaintiff-Appellant,**

v.

**SAPAG, S.A., Defendant-Appellee.**

No. 77–3486.

United States Court of Appeals,
Fifth Circuit.

Sept. 11, 1980.

Leslie J. Schiff, Opelousas, La., for plaintiff-appellant.

Phelps, Dunbar, Marks, Claverie & Sims, Rutledge C. Clement, Jr., New Orleans, La., for defendant-appellee.

Before GEE, TJOFLAT and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant Standard Fittings, a Delaware corporation, is engaged in the business of manufacture, purchase, sale and distribution of high-pressure fittings, valves, unions and other items. Its business is centered in Opelousas, Louisiana. Appellee Sapag, S.A. is a French manufacturer of high-pressure fittings. It has not qualified or been licensed to do business in Louisiana. Appellant brought suit in a Louisiana state court against appellee for alleged breach of an exclusive distributorship contract between the parties. The case was removed to federal district court pursuant to 28 U.S.C. § 1441 (1976). Subject matter jurisdiction is predicated on diversity of citizenship.

We are asked in this appeal to review the district court's dismissal of the case for lack of in personam jurisdiction over appellee Sapag. The district court held that Sapag was not amenable, under the Louisiana Long-Arm Statute and principles of constitutional due process, to the personal jurisdiction of a Louisiana court. *Standard Fittings Co. v. Sapag, S.A.*, 448 F.Supp. 426 (W.D.La.1977). Because we conclude that both Louisiana law and the due process clause of the fourteenth amendment to the Constitution permit the exercise of in personam jurisdiction over Sapag, we reverse and remand to the district court for trial.

## FACTS

Our inquiry into the applicability of the Louisiana Long-Arm Statute and the due process implications of the exercise of in personam jurisdiction over Sapag is a fact-sensitive one. The facts relevant to Sapag's motion to dismiss for lack of in personam jurisdiction derive from the pleadings, memoranda, affidavits, attachments and correspondence on file in the record.

It appears from the record that Sapag's first contact with the forum state, Louisiana, came with the visit [1] in the fall of 1973 of L. L. Frederick,[2] marketing consultant

---

1. The district court made no mention of this contact of Sapag representatives with Louisiana, probably because of its legal conclusion with respect to the meaning of "transacting business", a conclusion which we discuss and disavow, *infra*, in section 1 b. of this opinion.

2. The nature of the relationship between Mr. Frederick and Sapag is characterized quite differently by the parties. Sapag contends that Frederick had no authority to contract on its behalf. Standard Fittings claims that Frederick had both actual and apparent authority to bind Sapag. The affidavit of Leonard L. Frederick, R. 55–56, reveals that, during the time relevant to this case, Frederick was under contract with Sapag to promote Sapag's products. Frederick was obligated to spend approximately fifty days per year of his time on Sapag's behalf. Frederick swears, "[d]uring the approximately five years the contract was in effect, I served Sapag by introducing the company and its

product to various engineering contracting companies in the United States and by conveying information to such companies about the Sapag products, but I have never made a contract on their behalf and have never received any legal process on their behalf except for the Citation and Petition in this case." Correspondence in the record between Frederick, based in Whippany, New Jersey, and Standard Fittings in Opelousas shows that Mr. Frederick did indeed act on behalf of Sapag in the business dealings between Sapag and Standard Fittings. See Record 29, 70, 71, 72. Mr. Frederick wrote his letters to Standard Fittings on stationery with the heading "SAPAG" in bold letters at the top center and

U. S. Corresponding Office
L. L. Frederick
15 Crestview Terrace
Whippany, New Jersey 07981

for Sapag, and Georges LeLievre, sales manager of Sapag (R. 180) to the office of Dixie Supply Mill Company in New Orleans, Louisiana. While the visit itself is undisputed, its nature and purpose are described differently by the parties. LeLievre, in an affidavit filed in support of Sapag's motion to dismiss, swears that this visit was "a brief stop . . . to investigate any possibility of cooperation as a follow-up of a price inquiry for valves that Dixie Mill sent to Sapag; no agreement was reached. Following this abbreviated conference, affiant and consultant left the State of Louisiana the same day without further conferences with or visits to other fittings dealers in that state." (R. 180). Mike Cahn, president of Dixie Mill Supply Co., Inc., swears, in pertinent part, in his affidavit filed on behalf of Standard Fittings:

2. That sometime during 1973, Mr. L. L. Frederick and Mr. G. LeLievre called upon Dixie Mill Supply Co., Inc. in New Orleans at its offices in New Orleans, Louisiana, for the purpose of soliciting business. That Frederick and LeLievre on behalf of Sapag asked affiant to take on the Sapag line as a distributor for the company in the Southern part of the United States.

3. That affiant after the visit by Sapag representatives in his plant in New Orleans, Louisiana, informed Standard Fittings Company's president, Irwin H. Davlin, of the fact that Sapag was interested in a United States outlet for its products. (R. 160). The affidavit of Jules Cahn, Vice-President of Dixie Mill Supply Co., Inc., is to the same effect (R. 151). The district court failed to acknowledge this Fall, 1973, contact between Sapag and the State of Louisiana. We find that omission significant because the Cahn affidavits swear that LeLievre and Frederick came to Louisiana soliciting business on behalf of Sapag. LeLievre's affidavit, while indicating that the visit was a follow-up to a price inquiry, does not deny that Sapag had asked the Cahns to take on the Sapag line as a distributor for the Southern part of the United States. A letter written by Frederick to Jules Cahn and filed subsequent to the filing of the Cahn affidavits referred to above supports the contention that Sapag was interested in importing its product to the United States, and specifically to New Orleans.[3] The Cahn affidavits are also uncontradicted in their suggestion that Standard Fittings learned about Sapag through the Cahns as a result of the 1973 visit by Sapag's Frederick and LeLievre. The affidavit of Irwin Davlin, President of Standard Fittings, supports this view. Davlin swears that "it was as a result of this trip into

at the top right. While Mr. Frederick may not have had authority to contract on behalf of Sapag, an issue we need not reach, it is clear, from the letters and telex messages exchanged between Frederick and representatives of Standard Fittings, that Frederick's role was to facilitate the ordering, shipment and delivery of products manufactured by Sapag for Standard Fittings under the agreement which is the subject of this suit.

**3.** The letter dated May 2, 1973, reads as follows:

Mr. Jules Cahn
Dixie Mill Supply Co.
P. O. Box 52005
New Orleans, Louisiana 70150

Dear Mr. Cahn:
As suggest [sic] by mr [sic] Mike E. Cahn in a recent telephone conversation, we are enclosing our catalogs SB71R on Forged Steel Fittings, SR72R and Forged Steel Valves and SC72RJ on Safety Relief Valves.

All valves and fittings are made strictly to American specifications.

We make two lines of valves, the hancock under license from Dresser which we cannot import to the U.S.A and the Chervet line (our own) *which we would like to import to the U.S.A.* The quality of these two valves are [sic] on a par and a picture of the Chervet valve is shown inside the back cover of SR72R. If you would like to check out the prices on a representative container or half-container lot, that is 37,000 or 20,000 lbs. give us the sizes you would like and the trim and we will give you a CIF price and weight study for shipment to *New Orleans.*

Please let us hear from you as we believe we can give you a very satisfactory price arrangement.

Very truly yours,
L. L. Frederick

Encl. Cats.
(emphasis added); (R. 165).

Louisiana [the Fall, 1973, visit of LeLievre and Frederick] that Standard Fittings Company learned of the willingness of Sapag to sell its French made products in Louisiana . . . ." (R. 138).

The relationship between Sapag and Standard Fittings began when Shelton Courville of Standard Fittings in Opelousas and L. L. Frederick on behalf of Sapag in New Jersey spoke over the telephone about Sapag's products. As a result of the conversation, Frederick arranged to have a catalog and additional information, including samples, sent to Standard Fittings. (See letter from Frederick to Courville of January 22, 1974, at R. 140).

In February, 1974, Irwin Davlin, president of Standard Fittings, went to France where he met and negotiated with L. R. Guillemin and R. Patteeuw of Sapag. These three signed an agreement dated February 19, 1974, which is the subject of this suit.[4] The agreement[5] contemplated a substantial volume of business.[6] It provided that Standard would order 27,500 unions for each month of 1974, beginning in May, and that if Standard purchased a certain average number of unions from Sapag in 1974, Sapag would give Standard an annu-ally renewable exclusive distributorship for unions (in excess of 350,000 annually) and fittings (approximately 420,000) beginning in 1975. Sapag agreed to accept no further orders for unions or fittings from the USA or Canada for the balance of 1974 except for previous commitments. The agreement also contemplated the grant to Standard Fittings of an exclusive representation of Sapag valves in North America. The agreement provided for shipment by Sapag of its products CIF New York City or Houston, and it provided that "Standard may sell and Sapag on request will ship for Standard to any port of the world except Europe." It required that Standard Fittings obtain a bank letter of credit in favor of Sapag.[7] Finally, the agreement recited that its general purpose was "to develope [sic] a relationship whereby Standard or its assignee shall be exclusive North American distributor for Sapag." [8]

Following the agreement in Paris, Frederick corresponded with Standard Fittings Co. by letter (R. 141; 72) and telex (R. 142; 73). Frederick arranged to visit Standard Fittings' plant and to meet with Mr. Davlin on the morning of May 10.[9] The scheduled meeting was apparently delayed, but Mr.

---

4. Record 12–15

5. The question whether this agreement was binding, while critical to the merits of this case, is not crucial to the determination of the issue before us. What is important for our purposes is what actions occurred in furtherance of the agreement, what the agreement of the parties contemplated and what performance actually occurred. See Jetco Electronic Industries, Inc. v. Gardiner, 473 F.2d 1228, 1232 (5th Cir. 1973), where we noted that in order to show that the forum's jurisdictional statute is satisfied, plaintiff need only show a prima facie cause of action.

6. The precise dollar amounts involved are not relevant to our inquiry. However, the order forms included in the record indicate monthly amounts ranging from approximately $48,000 to $63,000.

7. This was done through the First National Bank of Commerce in New Orleans and under the terms of the guarantee, payment was made in New Orleans, Louisiana, by Standard Fittings Company to Sapag for all shipments of goods. Affidavit of Davlin, item 11, R. 138.

8. Record 15.

9. Frederick's telex message reads in pertinent part as follows:

3 MAY 1974, ATTN. MR. DAVLIN, REFERENCE TO YOUR INQUIRY FOR VALVE SOME TWO WEEKS AGO AND OUR CONVERSATION TODAY. THE FOLLOWING IS OUR BASE PV . . . (SCHEDULE OMITTED).
THE ABOVE EXPRESSED IN U.S. DOLLARS FOR FRENCH PORT. INVOICES WILL REFLECT THE QUARTERLY ADJUSTMENT OF PRICE AT THE TIME OF SHIPMENT.
LONTG [sic] TERM DELIVERIES UNDER A PROJECTED SCHEDULE CAN START ON A MONTHLY BASIS STARTING 1 ST JANUARY 1975.
WE CAN GIVE YOU THE FOLLOWING ITEMS DURING THE MONTH OF OCTOBER WHICH AMOUNT TO ABOUT A HALF OF A CONTAINER (10 TONS) . . . (SCHEDULE OMITTED).
NO SHIPMENT OF 1½ AND 2″ . . . (SCHEDULE OMITTED). WILL BE PACKED IN LIGHT BOXES IN THE CONTAINER. ADD TWO PERCENT TO TOTAL PRICE FOR CIF SHIPMENT TO HOUSTON.

Frederick did in fact visit the Standard Fittings plant in Opelousas in June, 1974, "[p]ursuant to his promotional endeavors relative to the North American market . . . ." (Affidavit of Jacques Oyer, president of Sapag, S.A., R. 110).[10]

In September, 1974, Davlin again went to France and certain portions of the agreement between Standard Fittings and Sapag were amended.[11]

> I SHALL PLAN TO VISIT YOUR PLACE ARRIVING IN THE EVENING OF MAY 9 AND SPEND THE MORNING OF 10 MAY WITH YOU AT THE OFFICE.
> WE CAN FURTHER OUR DISCUSSION OF THIS PROPOSAL THEN.
> BEST REGARDS. L. L. FREDERICK, SA-PAG, U.S.A. WIPY

10. The district court found that it was "unclear what business, if any, was conducted on this visit." *Standard Fittings Co. v. Sapag, S.A.,*

In February, 1975, Sapag's LeLievre and Patteeuw visited the Standard Fittings plant in Opelousas. LeLievre and Patteeuw arrived in Opelousas on the evening of February 6, 1975, and had dinner at Mr. Davlin's home. (Oyer affidavit, R. 110). The next day, February 7, they met with Davlin at the Standard Fittings plant. They left Louisiana later that day. Letters [12] written by LeLievre to Davlin subsequent to the visit of Patteeuw and LeLievre

448 F.Supp. 426, 427–8 (W.D.La.1977). The telex message quoted in footnote 9, above, shows that Frederick contemplated further discussion of the business proposal discussed by Frederick and Davlin, a proposal apparently involving long-term delivery of valves to Standard Fittings, CIF shipment to Houston.

11. Davlin affidavit, R. 137; R. 16–18.

12. These letters written by Mr. LeLievre to Mr. Davlin read as follows:

> Mr. I. DAVLIN
> President
> STANDARD FITTINGS COMPANY
> P. O. Box 1268
> OPELOUSAS - LOUISIANA 70570
> UNITED STATES

N/RÉF GL/HD
03/5334

Rosny, February 25th 1975

Dear Mr. Davlin,

Some time has already passed since Mr. Patteeuw and I had the pleasure of visiting with you in Opelousas.

Please accept my apologies for thanking you with such a delay for the kind welcome you extended to us in your house and in your plant.

Since we returned, we have been studying very carefully the various possibilities we have to supply you with material in accordance with the last conversation we had in your office and we expect to inform you of our position early next month.

We are also looking to the question also discussed in Opelousas of possibly purchasing 304 or 316L Stainless Steel Screwed Fittings from you if prices are attractive, and shall appreciate receiving up to date information or price list from you at your earliest convenience.

Hoping to find a satisfactory solution to our present problems, I remain,

Very Truly Yours

G. LELIEVRE

Note 12—Continued

**DIRECTION COMMERCIALE**

91, B⁴ .D'ALSACE-LORRAINE
93175 ROSNY-SOUS-BOIS
TÉL. 528.06-90 + et 06-94 +
TÉLEX 22.368 SAPAG - ROSNY

MAR 1 4 1975

Mr L. DAVLIN
President
STANDARD FITTINGS COMPANY
P. O Box 1268
OPELOUSAS
Louisiana          U. S. A.

N/RÉF. GL/AM 03/5336

V/RÉF.

L

Rosny, March 10th 1975

Dear Mr Davlin,

Following our latest discussion in Opelousas and as indicated in our letter dated 25th February, we have investigated what could be, presently, for SFC our very best possibilities of supply of unions and valves, both fields for which a cooperation was initiated in 1974.

Starting from that investigation, we have drafted a schedule of deliveries which is herewith attached and which we comment hereafter :

As far as forged steel valves are concerned, the one order for valves which you sent us in July 1974 has been partially delivered in October 1974 for one third of the quantities. The remaining two thirds could be made available by July and November 1975. The present trend of the international market being more and more for welded bonnet instead of bolted bonnet valves has led us to redirect our production to this type of equipment and consequently it is the welded bonnet model of valve which we could then supply to you.

In last July, we had quoted you prices in US$ when at that time the rate of exchange was 1 US $ = 4.90 FF. When expressed in FF our prices are unchanged but, you will understand that the US$ fluctuations and its present rate unfortunately do not allow us any longer for a payment in that currency as in the past. Hence the reason of our quotation in french francs mentioned during our visit to Opelousas.

Furthermore, as was previously discussed, we have had, much to our regret, to up-date the prices in connection with the still increasing cost of the raw materials and the attached schedule based on our tariff in effect in January 75 takes this into account. However, to lessen the consequences, please note that, quite exceptionnally, the indicated prices will remain firm during the whole duration of the delivery period of the equipments shown in the schedule.

As for the unions we have shown separately the container which was scheduled for 1974 delivery in the corresponding order acknowledgement and the three other containers, i. e. four altogether, which we could ship to you up to the end of 1975. You will see that a container could thus be delivered every quarter.

to Opelousas make it quite clear that the agreement between Standard Fittings and Sapag had been the subject of discussion and negotiation during the visit.

Finally, it appears that Sapag actually delivered some quantity of its product (valves) to Standard Fittings.[13]

## THE LEGAL STANDARDS

In determining whether Sapag is subject to in personam jurisdiction of the Louisiana courts and hence the federal court to which the action against it was removed, we follow a two-step analysis. *Jetco Electronic Industries, Inc. v. Gardiner*, 473 F.2d 1228 (5th Cir. 1973). We must determine, first, whether Sapag is amenable to service under the Louisiana Long-Arm Statute. Louisiana law controls this question. *Jetco Electronic Industries, Inc. v. Gardiner*, 473 F.2d at 1232; *Barrett v. Browning Arms Co.*, 433 F.2d 141 (5th Cir. 1970). If the requirements of the Louisiana Long-Arm Statute are satisfied, we must next apply federal law "to determine whether assertion of jurisdiction over the defendant comports with

Note 12—Continued

Concerning the prices, no modification would be brought up on the basis of our tariff in french francs for the first container, but the following one scheduled for delivery during the second quarter would bear the price increase we have been met with at the end of 1974 (see our nett price list 216 AU herewith attached) and in the same way, the prices of the third and fourth quarters deliveries should be discussed and agreed upon respectively on the 1st of July and on the 1st of October prior to actual shipment. For reasons indicated above, settlement should be made in french francs.

The letter of credit which you had kindly opened with the First National Bank of Commerce expires in a few days, its extension should be considered if, as we do hope, a cooperation on the above basis can be contemplated.

As we are "freezing" the offered equipments until the end of March, I am sure you will understand that any answer from you before that time would be more than appreciated and, looking forward to hearing from you and your acceptance of this proposed scheme, I remain, Dear Mr Davlin,

Very truly yours,

G. LELIEVRE
General Sales Manager

13. See March 10, 1975, letter from LeLievre to Davlin. The district court assumed that the delivery of any of Sapag's product to Standard Fittings occurred in Houston or New York, thereby terminating Sapag's performance. The district court thus found that the presence in Louisiana of any Sapag product was due to the action of Standard Fittings. We see no reason to disturb these findings. We note, however, that "jurisdiction does not depend on the technicalities of when title passes." *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 197 n.8 (5th Cir.

due process." *Jetco Electronic Industries, Inc. v. Gardiner,* 473 F.2d at 1232 (5th Cir. 1973).

### 1. Long Arm Statute

We inquire first whether Sapag is subject to in personam jurisdiction under the Louisiana Long-Arm Statute. That statute, La. Rev.Stat.Ann. § 13:3201 (West), provides in pertinent part: [14]

> Personal jurisdiction over nonresidents A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from the nonresident's
>
> (a) transacting any business in this state

The question we must address is: what is "transacting any business" in Louisiana under Louisiana law? The district court judge found that under the principles of *Benjamin v. Western Boat Building Corp.,* 472 F.2d 723 (5th Cir.), *cert. denied,* 414 U.S. 830, 94

1980), *citing Eyerly Aircraft Co. v. Killian,* 414 F.2d 591, 595–6 (5th Cir. 1969).

**14.** The Louisiana Long-Arm Statute, as amended in 1977, reads in full as follows:

> **§ 3201. Personal jurisdiction over nonresidents**
>
> A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from the nonresident's
>
> (a) transacting any business in this state;
>
> (b) contracting to supply services or things in this state;
>
> (c) causing injury or damage by an offense or quasi offense committed through an act or omission in this state;
>
> (d) causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state; or
>
> (e) having an interest in, using, or possessing a real right or immovable property in this state.
>
> (f) non-support of a child or spouse or a former spouse domiciled in this state to whom an obligation of support is owed and with whom the nonresident formerly resided in this state.

While it is not clear that Standard Fittings is attempting to assert jurisdiction only under the provisions of section (a) of the Long-Arm Statute, we limit our inquiry to the applicability of that section as did the court below. Because

S.Ct. 60, 38 L.Ed.2d 64 (1973), correspondence between Louisiana and France and the remittance for goods made through Louisiana banks could not be characterized as the transaction of business. He found that the inability of Sapag's agent L. L. Frederick to contract on Sapag's behalf "prohibits the conclusion that Frederick's visit to Louisiana resulted in the transaction of business." Finally, he found that a business transaction under the statute "contemplates the finalization of a negotiation process." *Standard Fittings Co. v. Sapag, S.A.,* 448 F.Supp. 426, 429 (W.D.La.1977).

We think that the district court judge erred in his application of the law. Specifically, we think that the district court judge has read too narrowly the jurisprudence of Louisiana with respect to the reach and the requirements of the Long-Arm Statute.[15] We find that the Louisiana

we find the requirements of section (a) were met, we need not address whether section (b) of the Long-Arm Statute might apply in this case as well.

**15.** The district court concluded that the only relevant business activity would be finalization of the contract in Louisiana for purposes of the Long-Arm Statute. This erroneous legal conclusion led to the further erroneous conclusion that Frederick's contacts in Louisiana on behalf of Sapag were irrelevant because he was an agent without authority to conclude contracts. The district court's determination that Sapag's *other contacts with the forum state were irrelevant* as well also appears to flow from this erroneous view of the requirements of the Long-Arm Statute.

We note further that in deciding that the requirements of the Louisiana Long-Arm Statute were not met, the district court relied heavily on *Benjamin v. Western Boat Building Corp., supra.* To the extent that the district court relied on *Benjamin* to elucidate the meaning of "transacting business" under the Louisiana Long-Arm Statute, that reliance was misplaced. The *Benjamin* case was decided exclusively on the basis of a due process analysis: the court declined to reach the question of whether the contacts with the forum there amounted to "transacting . . . business" under the Louisiana Long-Arm Statute. 472 F.2d at 725. The court, instead, measured the contacts between the defendants and the forum against the requirements of due process and found the contacts insufficient. Thus while we must consider *Benjamin* in resolving the issue

Long-Arm Statute was intended to reach to the limits of due process and that "transacting business" does not require finalization of the negotiation process or authority to contract on the part of agents who engage in business activity within the forum state on behalf of defendant.

### a. The Reach of the Long-Arm Statute

The comments of the Louisiana State Law Institute, published in connection with the 1964 Long-Arm Statute, indicate the statute's intended reach. Comment (a) reads:

> Comments of Louisiana State Law Institute—1964
>
> (a) R.S. 13:3201 through 13:3207 were adopted on the recommendation of the Louisiana State Law Institute to permit the courts of this state to tap the full potential of jurisdiction in personam over nonresidents permitted by *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057 (1945); and *McGee v. International Life Insurance Company*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

Comment (d) reads:

> (d) "Transacting business", as used in Subdivision (a), is a term which is much broader than "doing business" as defined by earlier Louisiana cases, and the phrase "does * * * business" of Subdivision (d) conferring personal jurisdiction over a nonresident on a cause of action arising

ex delicto or quasi ex delicto. *It is intended to mean a single transaction of either interstate or intrastate business, and to be as broad as the phrase "engaged in a business activity" of R.S. 13:3471(1).*

(emphasis added).

The Louisiana Court of Appeal has held that § 13:3201 was intended to permit the exercise of in personam jurisdiction to the full limits of due process. *Aucoin v. Hanson*, 207 So.2d 834 (La.App.1968); *Mayeux v. Hughes*, 333 So.2d 273 (La.App.1976). We note that this court said in *Benjamin v. Western Boat Building Corp.*, 472 F.2d 723 (5th Cir.), *cert. denied*, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64 (1973), that "it is unclear whether the Louisiana statute was intended to go to the permissible limits of due process in the exercise of in personam jurisdiction in *contract* cases . . . ." (emphasis added) 472 F.2d at 725. This idea was repeated in *Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184, 185 n.2 (5th Cir. 1978). The *Benjamin* court referred to a suggestion by a Louisiana commentator [16] that Louisiana courts restrict the Long-Arm Statute to a narrower scope in contract cases as compared to tort cases. We reject that suggestion. The Louisiana courts have repeatedly stated without qualification that § 13:3201 was intended to extend to the limits of due process. *Aucoin v. Hanson*, 207 So.2d 834 (La.App.1968); *Mayeux v. Hughes*, 333 So.2d 273 (La.App.1976).[17]

before us, its value lies not in its interpretation of the meaning and requirements of the Louisiana Long-Arm Statute but rather in the light it casts on the requirements of due process.

**16.** *See* Lewis, *Suing a Nonresident—the Reach of Louisiana's Long-Arm Statute*, 19 La.B.J. 205 (1971).

**17.** The *Benjamin* panel mentioned several cases as possible support for a more limited jurisdictional reach in contract cases, but expressly declined to consider the question. We find that the cited cases do not support the distinction, and in any event the cases are all distinguishable from the instant case. In *Bowlero v. Allen*, 205 So.2d 196 (La.App.1967), the plaintiff (Louisiana corporation) sued defendant (Texas resident) in Louisiana for a declaratory judgment seeking to determine the plaintiff's legal re-

sponsibility to its co-plaintiffs on certificates of indebtedness acquired by defendant through a series of endorsements. The defendant's only contact with Louisiana, the forum state, was that he sent demand letters to co-plaintiffs in Louisiana. The Louisiana court refused to exercise in personam jurisdiction because it found that the making of a demand for payment does not amount to transacting business and because the cause of action did not arise out of the mailing or receipt of demand letters.

In *Moore v. Evans*, 196 So.2d 839 (La.App.), *writ refused*, 250 La. 894, 199 So.2d 914 (1967), plaintiff (Texas resident) sued defendant (Louisiana resident) in Louisiana to have a judgment rendered in Texas (for plaintiff and against defendant) recognized. The suit in Texas had been on a note signed by defendant in Louisiana but payable in Texas. Refusing to find

More importantly, both the Louisiana Supreme Court and the Louisiana Court of Appeal, in cases decided after *Benjamin* and after the 1971 article by the Louisiana commentator, have similarly described the

personal jurisdiction under the Texas statute proper, the Louisiana court said, "[t]here is no showing that defendant did anything in connection with the note sued on except signing it as a co-maker in Louisiana." There was evidence that defendant had made several trips to Texas on behalf of another company of which he was the director, but there was no showing whether that company and the company obligated under the note were the same. The court, deciding the case on the basis of due process, said, "plaintiff has not shown that defendant conducted any business in Texas so as to bring him within the [*International Shoe*] doctrine." 196 So.2d at 840.

In *Fidelity Credit Co. v. Bradford*, 177 So.2d 635 (La.App.1965), B (Louisiana resident) was the maker of a promissory note payable to V–M of Louisiana, and purchased by F. F sued B in Louisiana, and B sued V, an Oklahoma corporation. V was a wholesaler which sold central vacuum cleaner units to retailers in Louisiana but had no control over the subsequent sale of the units and otherwise had no contact with Louisiana. Although the Louisiana court refused to find personal jurisdiction, it drew no distinction between contract and tort cases for purposes of the exercise of in personam jurisdiction. Moreover, it expressly noted that the Louisiana Long-Arm Statute, was intended to be as broad as, though not broader than, due process would allow.

*See also Riverland Hardwood Co. v. Craftsman Hardwood Lumber Co.*, 259 La. 635, 251 So.2d 45 (1971) which is discussed in footnote 18.

18. We observe, however, that there is a distinction drawn in Louisiana jurisprudence between the contacts sufficient for the exercise of in personam jurisdiction in a contract case involving a nonresident buyer as compared to a contract case involving a nonresident seller. *Riverland Hardwood Co. v. Craftsman Hardwood Lumber Co.*, 259 La. 635, 251 So.2d 45 (1971); *Kalvar Corp. v. General Micrographics*, 318 So.2d 71 (La.App.), *writ refused*, 322 So.2d 773 (La.1975). That distinction, however, is a matter of due process, not the definition of "transacting any business." *Kalvar* at 73. The Louisiana Supreme Court in *Riverland* explains the differences between foreign purchasers and foreign sellers with respect to the due process clause: (1) interstate sellers should be aware that most states require them to go to the residence of the purchaser to sue on a claim arising from the transaction; (2) interstate sellers can usually travel more easily to foreign jurisdictions; (3) sellers accept the possibility

full reach of the statute in a contract setting. *Adcock v. Surety Research and Investment Corp.*, 344 So.2d 969, 971 (La. 1977); *Latham v. Ryan*, 373 So.2d 242 (La. App.1979).[18] We are, therefore, confident

that they will have to travel to foreign jurisdictions to enforce their rights as a risk of interstate business; (4) there is no reason for mail order purchasers to expect that they might be sued in a distant forum for failure to pay for an isolated purchase in a foreign state; (5) sellers usually are engaged in business for profit; (6) many buyers of goods from a foreign jurisdiction are consumers satisfying personal needs or pleasure and not pursuers of profit; (7) buying is not traditionally the same as doing business; (8) buyers do not normally contemplate the use of the courts of the seller's state. *Riverland Hardwood Co. v. Craftsman Hardwood Lumber Co.*, 259 La. 635, 251 So.2d 45, 47 (1971). Thus, the court concludes, "[s]uch differences between interstate purchasers and interstate sellers support the conclusion that it would 'offend traditional notions of fair play and substantial justice' to allow a foreign state to subject an out of state purchaser to its jurisdiction." 251 So.2d at 47.

We express no opinion with respect to the soundness of this distinction between nonresident sellers and nonresident buyers in Louisiana jurisprudence. We suggest, however, that the distinction between buyers and sellers should be only one factor in the due process analysis, a factor which may have a bearing on the quality of the defendant's contact with the forum. This is so because a nonresident seller who sells his product within the forum state may, depending on the facts of the case, more purposefully avail himself of the benefits of the forum state than does a nonresident buyer who buys a product from within the forum state. The former may have significant, frequent and purposeful contacts with the forum in furtherance of its sales business, while the latter's contact may be but an isolated consumer purchase. Nevertheless, we suggest that the status of buyer or seller alone should not be determinative of the due process inquiry. It should be only one element which helps to describe the quality of the defendant's contact with the forum.

Finally, we point out that to the extent that the district court judge in the instant case relied on *Kalvar Corp. v. General Micrographics*, 318 So.2d 71 (La.App.), *writ refused*, 322 So.2d 773 (La.1975), to determine whether the requirements of the Louisiana Long-Arm Statute have been met in this case, his reliance was improper. *See Standard Fittings v. Sapag, S.A.*, 448 F.Supp. 426, 429 n.4 (W.D.La.1977). *Kalvar* was decided not on statutory grounds but on constitutional grounds. The Louisiana Court of Appeal in *Kalvar* stated with some reluctance that the case was controlled by the

that the Louisiana Long-Arm Statute permits the full due process exercise of personal jurisdiction over nonresident defendants.[19]

Having decided that the statutory inquiry is synonymous with the due process inquiry, we would ordinarily turn directly to the due process issue. We look first, however, to the Louisiana Court of Appeal's interpretation of the requirements of "transacting business" in order to assess the district court's conclusion that finalization of the contract in Louisiana is necessary under the Long-Arm Statute.

### b. The Requirements of the Long-Arm Statute

■ We next consider the meaning of "transacting business" under the Louisiana statute. Specifically, we inquire whether "transacting business" requires, as the district court found, "finalization of the negotiation process." We hold that under Louisiana law it does not. In *Aucoin v. Hanson*, 207 So.2d 834, 836 (La.App.1968), the Louisiana Court of Appeal, construing § 13:3201(a) in the context of a suit on a contract, held that "[t]he design of the Louisiana Long-Arm Statute was to reap the fullest benefit from United States Supreme

Court cases in which the due process requirements under the federal constitution have been relaxed, as such pertain to personal jurisdiction in civil suits." The court held that the defendant had "transacted business" within the meaning of § 13:3201(a) even though defendant's sole contact with the State of Louisiana was through an agent who apparently had no authority to contract on behalf of his principal. The agent carried out preliminary negotiations with the plaintiff in Louisiana. The contract was finally made between plaintiff and defendant in a telephone conversation. Its terms differed from those discussed by the plaintiff and defendant's agent. The court noted that it was as much a Mississippi contract as a Louisiana contract. Yet, despite the fact that defendant's agent had no authority to contract on behalf of defendant and the fact that "finalization of the negotiation process" occurred during an interstate telephone call between plaintiff and defendant, the court found that the defendant was transacting business within § 13:3201(a).[20]

We conclude that Louisiana courts have taken the position that "transacting business" under the Louisiana Long-Arm Stat-

---

principles set forth in *Riverland Hardwood Co. v. Craftsman Hardwood Lumber Co.*, 259 La. 635, 251 So.2d 45 (1971). In *Riverland*, the Louisiana Supreme Court approved a more restrictive standard of minimum contacts for nonresident purchasers, as compared to nonresident sellers. Although it mentioned other factors, the *Kalvar* court apparently found the defendant's status as a nonresident purchaser controlling in light of *Riverland* and affirmed the trial court's refusal to exercise jurisdiction. *Kalvar* is thus decisive neither of the statutory issue we face (because it was decided on constitutional grounds) nor of the constitutional issue we face (because its due process analysis apparently turned on defendant's status as a nonresident purchaser, a fact which we do not believe should be determinative, and because, in any event, we deal with a nonresident seller).

**19.** Our decision is not contrary to the holdings of, or even the dicta in, *Benjamin* and *Charia*. Any decision with respect to the reach of the Louisiana Long-Arm Statute in those cases would have been dicta because both cases were expressly based solely on the due process analysis. Moreover, the two cases did not even venture in dictum to say that the Louisiana

Long-Arm Statute fails to exercise jurisdiction to the full due process limits, rather they said only that the issue was unclear.

**20.** The Florida District Court of Appeals indicated that "transaction of business" occurs within the Louisiana Long-Arm Statute in the absence of "finalization of the negotiation process" in *Fisher v. Premiere Realty Co.*, 298 So.2d 447 (Fla.Dist.Ct.App.1974). There the court held that the three appellants, non-resident shareholders in a corporation, were transacting business under § 13:3201(a) by virtue of having personally guaranteed performance of a lease between the corporation and the Louisiana plaintiff; the corporation had operated a restaurant for two years on the leased premises located in Louisiana. The court said, "[w]hen the three of them undertook to guarantee performance of the lease by the corporation, it is our view that they thereby appointed the corporation as their agent to carry out the terms of the lease in Louisiana and were personally transacting business in Louisiana." 298 So.2d at 449.

ute does not require "finalization of the negotiation process."[21] Rather, the Louisiana courts have held that the Long-Arm Statute was intended to extend to the limits of due process. Business activity which will satisfy the requirements of due process will thus necessarily satisfy the "transacting business" requirement of the Long-Arm Statute. We, therefore, turn our inquiry to the requirements of due process.

### 2. Due Process

The district court found that Sapag's activities in Louisiana constituted a sufficiently minimal presence in Louisiana that it would be unfair to conclude that Sapag had given up its right to be sued only at its own domicile. Thus, the court found, appellant failed to show that the requirements of due process had been satisfied.

The issue we must address was formulated in the Supreme Court case, *International Shoe v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). There the Court held that in order to subject a nonresident defendant to in personam jurisdiction, that defendant must have certain minimum contacts with the foreign state.[22] Said the Court, "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present with the territory of the forum, he have certain minimum contact with it such that the maintenance of the suit does not offend internal 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S.Ct. at 158.

In *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), the Supreme Court gave expression to another factor which bears on the question whether the nonresident defendant has sufficient minimum contacts with the fo-

rum state to permit the exercise of in personam jurisdiction over him. That factor is the forum state's "interest in providing effective means of redress for its residents . . .." *Id.* at 223, 78 S.Ct. at 201. The Court pointed out that the suit in *McGee* was "based on a contract which had substantial connection with that State [California]." *Id.* at 223, 78 S.Ct. at 201.

In *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Supreme Court drew back from its trend toward expanding power to exercise personal jurisdiction over nonresident defendants, refused to allow the exercise of personal jurisdiction and held:

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule would vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities with the forum State, thus invoking the benefits and protections of its laws.

357 U.S. at 253, 78 S.Ct. at 1239.

The Supreme Court has addressed the in personam jurisdiction problem most recently in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In *World-Wide*, the Court said, "When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' . . . [cite omitted] it has clear notice that it is subject to suit there and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are

**21.** In our view, finalization of the agreement in Louisiana might have been a contact superior in quality to the actual contacts, taken singly, between Sapag and Louisiana. However, we conclude that such finalization is by no means necessary either to satisfy the requirements of the statute or to comport with due process.

**22.** There is no particular formula for showing that the due process requirement that a defendant have minimum contacts with the forum has

been satisfied. Showing that a nonresident defendant is transacting business within the forum state is but one mode of showing that the nonresident defendant has sufficient minimum contacts to satisfy the due process clause. Thus "transacting business" is simply a term which is descriptive of the aggregate of activities which, in combination, satisfy the requirements of due process.

too great, severing its connection with the State." 444 U.S. at 567, 100 S.Ct. at 567. And the Court noted further, "the foreseeability that is critical to due process analysis is . . . that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." 444 U.S. at 567, 100 S.Ct. at 567.

Several cases in this circuit offer guidance. In *Benjamin v. Western Boat Building Corp.*, 472 F.2d 723 (5th Cir.), *cert. denied*, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64 (1973), this court ruled: "while very little purposeful activity within a state is nec-

essary to satisfy the minimum contacts requirement, we have, nevertheless, unequivocally required *some* activity by the defendant before permitting the exercise of in personam jurisdiction under a state 'long-arm' statute, the jurisdictional touchstone being the presence of sufficient in-state business activity to indicate a purposeful enjoyment of the benefits and protections of that state's law." At 726. *See also Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184 (5th Cir. 1978).[23]

In *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483 (5th Cir. 1974)[24], this court

---

**23.** In both *Benjamin* and *Charia*, this court found that in personam jurisdiction should not be exercised over the defendant because the requirements of due process were not satisfied. The fact situations in *Benjamin* and *Charia* are similar in some respects to the facts in the instant case: all three cases involve the efforts of a Louisiana plaintiff to assert jurisdiction over a nonresident in a contract dispute. Nevertheless, there are critical differences which distinguish those cases from the instant case. Both *Benjamin* and *Charia* involved the sale of a boat to a Louisiana resident by a nonresident boatbuilder. In *Benjamin*, the negotiations were by mail; the contract was executed by mail; although the nonresident defendant knew that the home port of the vessel would be in Louisiana, the forum state, the sale at issue was defendant's only sale to Louisiana, and defendant never made repairs to the boat in Louisiana; although defendant did advertise in national magazines which were circulated in Louisiana, this court found that contact insignificant in the absence of sales activities or advertising in local media; and finally the independent firm, which defendant arranged to inspect the boat after plaintiff's complaints, was found by this court not to be acting in an agency or employee capacity for defendant. The two additional facts which were present in *Charia* were: first, that the defendant arranged for the delivery of the boat to Louisiana, the forum state; and second, the defendant had sold three additional boats to Louisiana residents over a five-year period. In both cases, the court found the sales to Louisiana residents to be isolated sales which did not imply purposeful enjoyment of the benefits and protections of Louisiana law on the part of the nonresident defendants. The *Charia* court noted "[t]his is not a case where defendant had supplied its product to the forum state in large quantities over a lengthy period of time." 583 F.2d at 189.

The instant case, by contrast, involves an ongoing business relationship between Sapag and Standard Fittings, a relationship which

contemplated continuing and substantial sales of Sapag's products and the management and operation of an exclusive distributorship for Sapag's products by Standard Fittings. In addition, Sapag representatives made three visits to Louisiana, two in furtherance of the business dealings between the parties, and the third involving a visit to another Louisiana company which resulted in Standard Fittings' learning that Sapag was interested in seeking an outlet for its products.

**24.** This court, in *Southwest Offset, Inc. v. Hudco Publishing Co.*, 622 F.2d 149 (5th Cir. 1980), recently reaffirmed and again applied the principles expressed in *Product Promotions v. Cousteau*. In *Southwest Offset*, the plaintiff (Texas printer, which "manufactured" telephone directories for defendant) sued defendant (Alabama publisher of telephone directories, which purchased the printing services of the plaintiff) in Texas on a series of contracts. Finding the case controlled by *Product Promotions*, we reversed the district court's dismissal for want of personal jurisdiction. Although defendant Hudco operated in Alabama and Mississippi only and no one associated with Hudco ever came to Texas in connection with the orders placed with Southwest, we found that Hudco had sufficient contacts with Texas to make it amenable to the personal jurisdiction of Texas courts. Hudco's contacts with Texas included the following:

(1) Hudco placed repeated orders in writing or over the phone after Southwest's original solicitation of Hudco's business through Southwest's sales representatives in Alabama; the orders were accepted by Southwest in Texas; the contracts were governed by Texas law;

(2) Payment for the orders was to be made at Southwest's office in Dallas, Texas, and Hudco in fact mailed some payments to Dallas;

(3) As a part of the printing process, Hudco mailed to Southwest's office camera-ready copy of the telephone directories;

described a two-part test for determining whether the exercise of in personam jurisdiction would deprive a defendant of due process: "First, 'there must be some minimum contact with the state which results from an affirmative act of the defendant,' i. e., purposeful activity. Secondly, 'it must be fair and reasonable to require the defendant to come into the state and defend the action.'" 495 F.2d at 494. In a footnote to this two-part test, the court identified several factors which various courts have used in determining whether the exercise of personal jurisdiction over a nonresident corporation comports with due process: the quantity of contacts, the nature and quality of the contacts, the connection of the cause of action to the contacts, the interest of the forum state in providing a forum for its residents, the convenience to the parties, and the nature and character of the business. 495 F.2d at 494 n.17.

Further explaining the first part of the two-prong test, the court in *Product Promotions* stated that purposeful activity of a defendant within the forum state implies that there must be *some* activity by the defendant and that it must "support an inference that the nonresident defendant purposefully availed himself of the benefits of conducting business in the forum." 495 F.2d at 495. The court went on to say that "even if the defendant performs no physical act within the State, activities outside the State can provide adequate contacts if they have reasonably foreseeable consequences within the State." 495 F.2d at 496. And finally, with respect to the purposeful activity prong of the test, the court said, "[t]he operative consideration is that the defendant's contacts with the forum were deliberate, rather than fortuitous, so that the possible need to invoke the benefits and protections of the forum's laws was reasonably foreseeable, if not foreseen, rather than a surprise." 495 F.2d at 496.

*Product Promotions* refined the second prong of the test which demands that it not be "unfair or unreasonable to require the nonresident defendant to defend the suit in the forum." 495 F.2d at 497–98. Among the factors to be considered in evaluating this part of the test are "the interest of the state in providing a forum for the suit, the relative conveniences and inconveniences to the parties, and basic equities." 495 F.2d at 498.

### THE DECISION

■ Applying the foregoing principles, we hold that the activities of Sapag, in combination, bring Sapag within the boundaries of the Louisiana Long-Arm Statute and the principles of due process, and thus subject it to the jurisdiction of the Louisiana courts. We summarize Sapag's activities as follows:

(1) In late 1973, Sapag's Frederick and LeLievre visited another Louisiana company, seeking an outlet for Sapag products. As a result of that visit, Standard Fittings learned that Sapag was seeking an American outlet for its products;

(2) In January, 1974, Frederick mailed Sapag catalog and samples to Standard Fittings in Louisiana;

(3) An agreement, signed in Paris on February 19, 1974, was reached between the parties which contemplated continuing and substantial sales of Sapag products to Standard Fittings. It provided that Standard Fittings, which has its principal offices and manufacturing facilities in Opelousas, Louisiana, would become exclusive distributor of Sapag products in North America. As such, Standard would manage sales and distribution of Sapag products and Sapag would, at Standard's direction, ship its products anywhere in the world except Europe;

(4) Correspondence by letter and telex was exchanged between Frederick on Sa-

(4) Hudco returned corrected proofs to Southwest;

(5) The books were printed and shipped to Hudco F.O.B. Dallas;

(6) All the directories which are the subject matter of this suit were printed in Texas and

Hudco knew that Southwest's only printing plant was in Texas.

*See also Gold Kist, Inc. v. Baskin-Robbins Ice Cream,* 623 F.2d 375 (5th Cir. 1980).

pag's behalf and representatives of Standard Fittings subsequent to the Paris agreement;

(5) In June, 1974, Frederick visited the Standard Fittings plant in Opelousas;

(6) In February, 1975, Sapag's LeLievre and Patteeuw visited the Louisiana plant and discussed the agreement between Standard Fittings and Sapag and problems that had arisen in connection with that agreement;

(7) Sapag made delivery of some of its product pursuant to its agreement with Standard Fittings;

(8) Standard Fittings arranged for a bank letter of credit in favor of Sapag through a New Orleans, Louisiana, bank.

These activities all related to the business relationship developed between Sapag and Standard Fittings and to the agreement which is the subject of Standard Fittings' suit. The early activities of Sapag in Louisiana, including the Fall, 1973, visit to Louisiana by Sapag agents, were to promote its product. Later Sapag engaged in activities, including on two occasions activities by Sapag agents in the State of Louisiana, to further performance of the agreement with Standard Fittings and to negotiate difficulties that had arisen under the agreement. The agreement itself contemplated continuing and substantial sales of Sapag products. The agreement contemplated performance by Standard Fittings in Louisiana by payment to Sapag through a Louisiana bank and by management of the exclusive distributorship of Sapag products.

We hold that the nature and quality of these contacts—having as their purpose the establishment of the Louisiana based company as the exclusive distributor for Sapag's products in North America—reveal the kind of purposeful activity which has been held to constitute sufficient minimum contacts. Sapag has purposefully availed itself of the privilege of conducting activities in Louisiana. We are inescapably drawn to the conclusion that the agreement entered into and the combined activities of Sapag show that it "transacted business" in Louisiana within the meaning of the Louisiana Long-Arm Statute, and demonstrate sufficient minimum contacts with the State of Louisiana to justify the exercise of personal jurisdiction over Sapag under the due process analysis. Sapag reasonably should have anticipated being haled into court in Louisiana.

We hold, further, that it is not unfair or unreasonable to require Sapag to defend a suit in Louisiana. *See Product Promotions, Inc. v. Cousteau*, 495 F.2d at 497–98. Sapag would have us believe that this dispute can only be litigated fairly in France. But we will not discount the interests of the Louisiana plaintiff so easily. Sapag, which has deliberately carried out business activities in Louisiana in connection with its avowed purpose of establishing an American corporation as an outlet for the distribution of its products in the U.S. and elsewhere in North America, cannot insist that it is amenable to suit only in France. We acknowledge that France may well have an interest in providing a forum for resolution of the dispute between these two parties. Similarly, however, the United States, and particularly Louisiana, have an interest in providing a forum. The parties involved here operate substantial businesses. The agreement between Standard and Sapag contemplated many thousands of dollars worth of sales annually. The State of Louisiana clearly has an interest in providing a forum for litigating a breach of a major contract[25] which proposed to establish a Louisiana based company as the exclusive distributor in North America for Sapag's products.

While it may be less convenient for Sapag to defend this suit in Louisiana, we find no reason why such inconvenience to Sapag should outweigh the inconvenience to Standard Fittings of prosecuting the suit in France, in light of Louisiana's interest in

---

**25.** We decline to attach special significance to the amount of damages at issue in this lawsuit, *i. e.*, over $2,600,000. We note simply that the record shows that the agreement involved thousands of dollars worth of sales and a potential exclusive distributorship.

providing a forum and Sapag's purposeful acts availing itself of the benefits of conducting business in Louisiana. *See Product Promotions v. Cousteau,* 495 F.2d at 495.[26]

The judgment of the district court dismissing the complaint against Sapag is accordingly

REVERSED AND REMANDED.

---

26. We note in this regard that Sapag has sent agents to Louisiana on several occasions to further Sapag's business interests.