**BILL REA INSURANCE ASSOCIATES, INC., and Billy F. Rea**

v.

**NATIONAL FINANCIAL SERVICES CORP. and Greenway Capital Corporation.**

**No. MO–93–CA–114.**

United States District Court,
W.D. Texas,
Midland–Odessa Division.

March 25, 1994.

---

Walter G. Petty, III, Theodore Stevenson, Robert Scogin, Kermit, TX, for Bill Rea Insurance Associates, Inc. and Billy F. Rea.

Jay Brandt, Paige Budd, Dallas, TX, for Greenway Capital Corp.

Rodney Acker, Andrew L. Siegal, Dallas, TX, for National Financial Services Corp.

## JUDGMENT AS A MATTER OF LAW

BUNTON, Senior District Judge.

On February 23, 1994, this case was tried before the Court. At the close of Plaintiffs' evidence, Defendant NATIONAL FINANCIAL SERVICES CORPORATION ("National") moved for Judgment as a Matter of Law pursuant to Rule 50 of the Federal Rules of Civil Procedure. In its Motion, National asked the Court to dismiss Plaintiffs' claims against it based upon a lack of personal jurisdiction. In the alternative, National requested that the Court elect not to exercise pendant jurisdiction over the Plaintiffs' state law claims. The Court took the Motion for Judgment as a Matter of Law under advisement. After a careful review of all of the relevant evidence presented at trial, the Court is now convinced there is no basis for personal jurisdiction over National in this case, and thus is of the opinion the Motion for Judgment as a Matter of Law should be granted.

### BACKGROUND

Plaintiffs' claims against National arise from the last of several allegedly unauthorized stock transactions.[1] Specifically, the instant lawsuit stems from a stock purchase order placed on May 20, 1993, by Defendant GREENWAY CAPITAL CORPORATION

---

**1.** A more detailed discussion of the facts surrounding these stock transactions appears in the Court's Findings of Fact and Conclusions of Law.

This Order only addresses the facts relevant to a determination of whether there is a basis for finding personal jurisdiction over National.

("Greenway"). On May 20, 1993, Greenway placed a stock purchase order through National for the purchase of 25,000 shares of Visual Cybernetics, Inc. ("Cybernetics") stock on behalf of the Plaintiffs.[2] Greenway is a registered stock brokerage firm in New York City, New York. Greenway places its stock purchase orders for their investment customers through what is commonly referred to as a "clearing broker" or "clearing firm." National was Greenway's clearing firm for the May 20, 1993 trade. In its capacity as a "clearing firm" National is responsible for the logistical aspects concerning the trades of its introducing brokers.[3] The typical responsibilities of a clearing firm include collecting the money for the stock purchase and maintaining monthly statements for the accounts of the introducing brokers' customers.

On May 25, 1993, the Plaintiffs wire transferred $161,255.00 to National to pay for a purchase of Cybernetics stock.[4] By noon of May 27, 1993, National settled and cleared the trade executed by Greenway. National then immediately transferred the 25,000 shares of Cybernetics stock to the Plaintiffs'

account (No. 577464) with Greenway. Prior to settlement on May 27, 1993, National had no communication with the Plaintiffs regarding the trade. The Plaintiffs claim, however, they made a brief[5] phone call to National to request that they "hold" the funds. This telephone call was made after the trade had been settled and cleared. Plaintiffs made no other attempt to contact National regarding the validity of the trade.

On May 27, 1993, National sent the Plaintiffs a Notice of Deficiency regarding the trade. The notice informed Plaintiffs that National would consider selling the 25,000 shares of Cybernetics stock to cover the deficiency balance (approximately $17,000.00) unless the balance was paid immediately. Over the next several weeks, National sent Plaintiffs three similar notices.[6] Plaintiffs did not pay the outstanding balance. Finally, on July 23, 1993, Greenway executed a forced sale of approximately 11,300 shares of Cybernetics stock to cover the $17,000.00 debit balance in National's Account No. 577464, held on behalf of the Plaintiffs.

On June 7, 1993, Plaintiffs filed this lawsuit claiming the May 20, 1993, trade was unau-

**2.** For purposes of clarity, the May 20, 1993, trade of Cybernetics stock will hereinafter be referred to as "the trade."

**3.** Greenway is what is commonly referred to as an "introducing broker" or "introducing firm." Once a trade agreement has been reached, the introducing firm (here, Greenway) contracts with the clearing firm (here, National) to facilitate the trade and handle the related paperwork. The relationship between the customer, the introducing firm, and the clearing firm are governed by a "Clearing Agreement." Under the terms of the Clearing Agreement between Greenway and National in this case, Greenway, as the introducing firm, was responsible for all personal contact and communication with the customers. Greenway was not only responsible for negotiating the trade, it was responsible for all complaints and communications after the trade was executed. National was responsible for handling the paperwork related to the trade, for transferring the money paid for the stock to the selling corporation, and for transferring the purchased stock to the Plaintiffs' account.

**4.** As explained in the Court's Findings of Fact and Conclusions of Law, the Plaintiffs contend this wire transfer was sent to National Financial under the direction of Don Caban and under the mistaken belief that it would be used to pay for a

previous purchase of 25,000 shares of Cybernetics stock. Don Caban is not affiliated with National in any way. Greenway and National contend the funds were sent to pay for the May 20, 1993 trade. The wire transfer from the Plaintiffs indicated it was to be applied to account No. 577464. This number corresponded with the account number of Greenway with National.

**5.** Telephone records introduced into evidence at trial indicate this phone call took place *after* the trade had been settled and cleared and only lasted approximately two minutes. Plaintiff Bill Rea testified he spoke to a person at National named "Pat." It was later determined at trial that "Pat" was probably a low-level employee for National. Plaintiffs claim that during this conversation they attempted to confirm the wire transfer and to disavow the trade. However, based upon the Clearing Agreement, the Plaintiffs were told that all complaints should be directed to their brokers and not directly to National.

**6.** There was evidence the notices contained the wrong address. However, under the Clearing Agreement, any mail returned based upon the wrong address was sent to Greenway. Moreover, the evidence indicates the Plaintiffs were told of the deficiency and potential forced sale by agents of Greenway long before the actual sale.

thorized. The Plaintiffs sued Greenway and National for violations of the Securities Act of 1934 (i.e., Section 10(b)(5)); under the Texas Blue Sky Act; for restitution (i.e., money had-and-received); and for conversion. National promptly filed a Motion to Dismiss, along with an extensive brief, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). The Court denied the Motion to Dismiss, but noted its concern regarding the apparent lack of personal jurisdiction over National. At that point in the litigation, the need to establish personal jurisdiction was minimal because of the generous nationwide service of process provisions in the Federal Securities Act. *See* 15 U.S.C. § 78aa. The Court denied the Motion to Dismiss in an attempt to allow the Plaintiffs the opportunity to establish personal jurisdiction through the discovery process.

After several months of discovery, and shortly before trial, the Plaintiffs dropped their cause of action against National under the Federal Securities Act. Thus, the nationwide service of process provisions of the Securities Act were no longer applicable and traditional concepts of personal jurisdiction over the remaining state law claims were brought into play. The case proceeded to trial on February 23, 1994. During the trial, National offered extensive evidence regarding its lack of minimum contacts with the State of Texas. In contrast, Plaintiffs offered no specific evidence (with the exception of the May 27, 1993, two-minute phone call) of National's contacts with the State of Texas. At the close of the case, National moved for Judgment as a Matter of Law based upon Plaintiffs' failure to show that National was subject to this Court's personal jurisdiction.

## DISCUSSION

This Court has a continuing duty to examine whether it has jurisdiction over a particular case and the litigants therein. Plaintiffs originally claimed the Court had subject matter jurisdiction based upon the existence of a federal question (i.e., the 10(b)(5) claim), and based upon diversity of citizenship.[7] However, because Plaintiffs voluntarily dismissed their federal claims against National, the only remaining ground for subject matter jurisdiction is diversity of citizenship. After a careful review of all of the documentary evidence and testimony at trial, the Court finds it does not have personal jurisdiction over National.

■ "A nonresident defendant is amenable to personal jurisdiction in a federal diversity suit to the extent permitted by a state court in the state in which the federal court resides." *Bullion v. Gillespie*, 895 F.2d 213, 215 (5th Cir.1990) (citing *Cycles, Ltd. v. W.J. Digby, Inc.*, 889 F.2d 612, 616 (5th Cir.1989)). Under Texas law, if a nonresident defendant moves to dismiss the case for lack of personal jurisdiction, the burden is on the plaintiff to establish the existence of personal jurisdiction over that defendant. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir.1985); *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545 (5th Cir.1985); *Saktides v. Cooper*, 742 F.Supp. 382, 384 (W.D.Tex.1990).

■ The Court's "inquiry thus starts with a review of the Texas Long–Arm Statute[8] ... [and continues with] whether the statutory exercise of jurisdiction comports with the due process concerns of the [F]ourteenth [A]mendment." *Polythane Systems v. Marina Ventures International*, 993 F.2d 1201, 1205 (5th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 1064, 127 L.Ed.2d 383 (1993). The Fifth Circuit has held that because "[t]he Texas Long–Arm Statute reaches as far as constitutionally permitted ... [,] the personal jurisdiction inquiry [necessarily] collapses into one of due process only." *Id.; see also Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 372–73 (5th Cir.1987). The Fifth Circuit uses a two-pronged analysis to determine whether exercising personal jurisdiction comports with due process. The two prongs are whether there are "(1) minimum contacts with the forum state; and (2) [whether] the exercise of personal jurisdiction, under the

---

7. There is no dispute that National is a Massachusetts corporation and its principal places of business are in Boston, Massachusetts, and New York City, New York.

8. Tex.Civ.Prac.Rem.Code Ann. §§ 17.041–.045 (Vernon 1986).

circumstances, ... [will] not offend 'traditional notions of fair play and substantial justice.'" *Polythane Systems,* 993 F.2d at 1203; *Command–Aire Corp. v. Ontario Mechanical Sales & Service, Inc.,* 963 F.2d 90, 94 (5th Cir.1992) (internal citations omitted).

■ Moreover, personal jurisdiction over a nonresident defendant can be "general" or "specific." *Bullion,* 895 F.2d at 216. General jurisdiction arises when the nonresident defendant maintains "systematic and continuous contacts with the forum state." *Polythane Systems,* 993 F.2d at 1203 (relying on *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415–16, 104 S.Ct. 1868, 1872–73, 80 L.Ed.2d 404 (1984)). Specific personal jurisdiction hinges on "whether the defendant purposefully availed [itself] of the privilege of conducting activities in-state, thereby invoking the benefits and protection of the forum state's laws ... [Moreover, general or specific personal] jurisdiction is improper if grounded in the unilateral activity of the plaintiff." *Bullion,* 895 F.2d at 216.

■ Under the first prong of the test enumerated above, the evidence indicates National does not have the requisite "minimum contacts" with Texas to support either general or specific personal jurisdiction. To the contrary, the record clearly indicates National does not have any systematic and continuous contacts with the State of Texas.

National is a Massachusetts corporation with its principal places of business in Boston, Massachusetts and New York City, New York. National is not incorporated in Texas. National also does not maintain a place of business in Texas, and it does not have any employees, agents, partners, or joint ventures in Texas. Nor does National own or lease any real estate or personal property in Texas. National also does not deal directly with Texas citizens who purchase stock in Texas, recruit Texas residents for employment inside or outside of Texas, or advertise, either directly or indirectly, in Texas. National's only contact with Texas citizens is due to its contractual relationship with the introducing-selling brokers who sell stocks in Texas. These occasional and indirect contacts with the State of Texas, initiated by the introducing firms and their customers, are insufficient to support finding personal jurisdiction based upon "continuous" or "systematic" contacts.

The same facts noted above clearly indicate there are not sufficient minimal contacts to support finding specific personal jurisdiction. As noted, National is not incorporated and does not do business in Texas. As a result, National has not purposefully availed itself of those benefits afforded to a licensed Texas corporation. In addition, there is no evidence regarding the amount or percentage of revenues which National receives from its introducing brokers based on stock sales in Texas.[9]

The only contacts between National and Plaintiffs were due to the voluntary actions of the Plaintiffs. The Plaintiffs sent the wire transfer to National Financial. The wire transfer specifically directed National to credit the funds to Greenway's account established on behalf of Plaintiffs. The evidence conclusively establishes National did not have any contacts with the Plaintiffs prior to the May 25, 1993, wire transfer. The Plaintiffs' only contact with National was the one two-minute telephone call to a low-level National employee on May 27, 1993. National, pursuant to industry practice and the Clearing Agreement with Greenway, told the Plaintiffs to contact their broker during this conversation. Plaintiffs' May 25, 1993, wire transfer and May 27, 1993, telephone call are precisely the "unilateral activity" which cannot form the basis for determining that National "purposely availed" itself of the benefits of the State of Texas.

Finally, although National did send the Plaintiffs three separate notices of a deficiency regarding the trade, warning the Plaintiffs the Cybernetics shares of stock might be sold to cover Plaintiffs' debit balance, the letters are not sufficiently connected with

9. Ms. Baker, National's Director of Compliance, testified at trial that National received between $18.00 to $20.00 dollars from Greenway for clearing the trade. Such a minimal return on the trade is insufficient to warrant a finding that National somehow has availed itself of a benefit of Texas.

Texas to support personal jurisdiction in Texas. It is well established that a nonresident defendant's actions must be "deliberate, rather than fortuitous, so that the possible need to invoke the benefits and protection of the forum's laws was reasonably foreseeable[.]" *Standard Fittings Co. v. Sapag, S.A.*, 625 F.2d 630, 643 (5th Cir.1980) (quoting *Products Promotions, Inc. v. Cousteau,* 495 F.2d 483, 496 (5th Cir.1974), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1981, 68 L.Ed.2d 299 (1981)). National's letters were incidental and necessary contacts in this case, and are "fortuitous" at best.

Moreover, under the second prong of the test, requiring National to defend this suit in Texas would also offend "traditional notions of fair play and substantial justice." *See Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 105, 107 S.Ct. 1026, 1028, 94 L.Ed.2d 92 (1987). This is so especially in light of the very minor role National played in the trade. To hold otherwise would mean that National, and any other clearing firm, could potentially be sued in any state court based solely upon the actions of the introducing brokers with which it did business. This reasoning does not comport with traditional ideas of fair play. "Determinations regarding the exercise of personal jurisdiction over non-resident defendants must be made on a case-by-case basis." *Polythane Systems,* 993 F.2d at 1205. Under the facts of this case, the Court finds there is no basis for finding personal jurisdiction over National.

## CONCLUSION

Based on the foregoing, the Court is of the opinion Defendant National's Motion for Judgment as a Matter of Law, based upon a lack of personal jurisdiction, should be granted. However, the dismissal of Plaintiffs' state law claims is without prejudice. Accordingly,

IT IS ORDERED Defendant National's Motion for Judgment as a Matter of Law, based on a lack of personal jurisdiction, is GRANTED. National is hereby DISMISSED from this cause without prejudice.