SHELL OIL COMPANY, A CORPORATION OF THE STATE OF DELAWARE, PLAINTIFF-APPELLANT, v. FRANK MARINELLO, DOING BUSINESS AS GARDEN SHELL STATION, PLAINTIFF-RESPONDENT.

FRANK MARINELLO, DOING BUSINESS AS GARDEN SHELL STATION, PLAINTIFF-RESPONDENT v. SHELL OIL COMPANY, A CORPORATION OF THE STATE OF DELAWARE, DEFENDANT-APPELLANT.

Argued June 4 and 5, 1973—Decided July 11, 1973.

Mr. *William Simon,* of the District of Columbia bar, argued the cause for appellant (*Mr. Michael W. Graney,* of the District of Columbia bar, and *Mr. Andrew S. Polito,* on the brief; *Mr. Michael M. Levy, Messrs. Howrey, Simon, Baker & Murchison,* of the District of Columbia bar; *Mr. Michael D. Loprete, Messrs. Mattson, Madden, Polito & Loprete,* attorneys).

Mr. *Joseph R. Mariniello,* argued the cause for respondent (*Messrs. Fierro, Fierro and Mariniello,* attorneys).

The opinion of the Court was delivered by

SULLIVAN, J. This case involves the interpretation of a lease and a dealer agreement entered into between Shell Oil Company (Shell) and Frank Marinello (Marinello), one of its service station operators, and a determination of the extent of Shell's right to terminate such lease and agreement.

Shell, a major oil company, is a supplier of motor vehicle fuels and automotive lubricants under the trade name "Shell." It also supplies tires, batteries and accessories (TBA) to its dealers for resale. Its products are sold in hundreds of Shell service stations through the State. Many of the service station locations are controlled by Shell through long-term leases. In the past, Shell's practice has been not to operate these stations itself, but to lease the station premises to an operator with whom it enters into a dealer or franchise agreement.

. This is essentially the relationship before us for consideration. Shell controls a service station located at Route #5 and Anderson Avenue, Fort Lee, Bergen County. In 1959 it leased the station to Marinello,[1] and at the same time en-

---

[1] The original lease and dealer agreement included Marinello and a partner. The partnership was dissolved in 1965 and Marinello continued as the sole tenant and dealer with Shell's approval.

tered into a written dealer agreement with the lessee. The original lease was for a one-year term and was regularly renewed in writing for fixed terms. The last lease between Shell and Marinello is dated April 28, 1969 and runs for a three-year term ending May 31, 1972, and from year-to-year thereafter, but is subject to termination by Marinello at any time by giving at least 90 days notice and by Shell at the end of the primary period or of any such subsequent year by giving at least 30 days notice.

The dealer agreement, also originally for a one-year term, was renewed in writing so as to coincide with the existing lease. Each agreement provided that Shell would supply its products to the dealer for resale at the Route #5 service station in question. The last dealer agreement is also dated April 28, 1969, and is for a three-year term ending May 31, 1972 and from year-to-year thereafter, but is subject to termination at any time by giving at least 10 days notice.

By letter dated April 14, 1972, Shell notified Marinello that it was terminating the aforsesaid lease and the dealer agreement effective May 31, 1972. Marinello immediately filed suit in the Superior Court, Chancery Division, seeking to have Shell enjoined from taking its proposed action, and asking for reformation of the "agreement" between the parties so as to show a joint venture. Shell on its part, on June 1, 1972, filed a summary dispossess complaint in the District Court for possession of the service station premises alleging that Marinello was holding over and remaining in possession without the consent or permission of Shell.

On motion, the dispossess action was transferred to the Superior Court (*N. J. S. A.* 2A:18–60) where it was consolidated with and tried with the Chancery suit. After a nine-day trial a decision was rendered in favor of Marinello. The trial court's opinion is reported at 120 *N. J. Super.* 357.

In its decision the trial court dealt with three primary issues. It held (1) the newly enacted Franchise Practices Act, *N. J. S. A.* 56:10–1 *et seq.,* effective December 21, 1971,

did not apply to the previously executed renewals of the lease and dealer agreement between Shell and Marinello; (2) there was an implied covenant in said lease and agreement on the part of Shell not to terminate the relationship without good cause, and these instruments must be reformed to include such covenant; and (3) Marinello had substantially performed his obligations to Shell under these agreements.

Although not necessary to its decision, since it not only granted reformation, but also found that Shell did not have good cause to terminate the lease and dealer agreement, the trial court sustained Marinello's defense of unclean hands in the dispossess action by finding that Shell was guilty of improper and illegal marketing practices (a) by discriminating against Marinello in the tank-wagon prices it charged him, and (b) by tying in increased TBA sales on Marinello's part to a renewal of the lease. These practices were found by the trial court to be violations of the New Jersey Unfair Motor Fuels Act, *N. J. S. A.* 56:6–19 *et seq.,* and the Robinson-Patman Price Discrimination Act, 15 *U. S. C. A.* § 13.

Shell appealed from the judgment entered in the consolidated actions. While the appeal was pending unheard in the Appellate Division we ordered direct certification to this Court. *R.* 2:12–1.

We are in full agreement with the basic determination of the trial court that Shell had no legal right to terminate its relationship with Marinello except for good cause, *i. e.,* the failure of Marinello to substantially comply with his obligations under the lease and dealer agreement. However, we conclude that it was unnecessary to have granted specific reformation of the lease and dealer agreement. The same end result is reached from consideration of the instruments themselves, the relationship between Shell and Marinello created thereby, and the public policy of this State affecting such relationship.

For this reason it is unnecessary for us to deal with the question of reformation, as such, as well as the ancillary issues

of parol evidence and the statute of frauds. By the same token, we need not review the trial court's finding that Marinello had established the defense of unclean hands in the dispossess suit filed by Shell. Since our conclusion is that Shell has not shown good cause to terminate its relationship with Marinello, we do not reach the question of equitable defense. See *Vineland Shopping Center, Inc. v. DeMarco,* 35 *N. J.* 459 (1961).

Shell argues that its lease of the service station premises to Marinello is independent of its dealer agreement with him, and that its legal rights as a landlord under the lease are absolute and cannot be restricted. This is pure sophistry. The two contractual documents are but part of an integrated business relationship. They were entered into simultaneously, have the same commencement and expiration dates, and expressly refer to the Route #5 service station premises.

These instruments, and the business relationship created thereby, cannot be viewed in the abstract. Shell is a major oil company. It not only controls the supply, but, in this case, the business site. The record shows that while the product itself and the location are prime factors in the profitability of a service station, the personality and efforts of the operator and the good will and clientele generated thereby are of major importance. The amount of fuel, lubricants and TBA a station will sell is directly related to courtesy, service, cleanliness and hours of operation, all dependent on the particular operator.

Marinello testified that when the station was offered to him in 1959 he was told by the Shell representative that the station was run down, but that a good operator could make money and that if he built up the business his future would be in the station. Shell's own witnesses admitted that it was Shell's policy not to terminate its relationship with a lessee-dealer except for good cause, which was described as not running the station in a good and businesslike manner.

Viewing the combined lease and franchise against the foregoing background, it becomes apparent that Shell is the dominant party and that the relationship lacks equality in the respective bargaining positions of the parties. For all practical purposes Shell can dictate its own terms. The dealer, particularly if he has been operating the station for a period of years and built up its business clientele, when the time for renewal of the lease and dealer agreement comes around, cannot afford to risk confrontation with the oil company. He just signs on the dotted line.

Where there is grossly disproportionate bargaining power, the principle of freedom to contract is non-existent and unilateral terms result. In such a situation courts will not hesitate to declare void as against public policy grossly unfair contractual provisions which clearly tend to the injury of the public in some way. *Henningsen v. Bloomfield Motors, Inc.* 32 *N. J.* 358, 403–404 (1960).

In *Ellsworth Dobbs, Inc. v. Johnson,* 50 *N. J.* 528, 553–554 (1967) we said:

"Courts and legislatures have grown increasingly sensitive to imposition, conscious or otherwise, on members of the public by persons with whom they deal, who through experience, specialization, licensure, economic strength or position, or membership in associations created for their mutual benefit and education, have acquired such expertise or monopolistic or practical control in the business transaction involved as to give them an undue advantage. *Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358, pp. 388–391 (1960). Grossly unfair contractual obligations resulting from the use of such expertise or control by the one possessing it, which result in assumption by the other contracting party of a burden which is at odds with the common understanding of the ordinary and untrained member of the public, are considered unconscionable and therefore unenforceable. * * * The perimeter of public policy is an ever increasing one. Although courts continue to recognize that persons should not be unnecessarily restricted in their freedom to contract, there is an increasing willingness to invalidate unconscionable contractual provisions which clearly tend to injure the public in some way. (Citing cases)."

Applying the foregoing to the case before us, it is clear that the provisions of the lease and dealer agreement

giving Shell the right to terminate its business relationship with Marinello, almost at will, are the result of Shell's disproportionate bargaining position and are grossly unfair. That the public is affected in a direct way is beyond question. We live in a motor vehicle age. Supply and distribution of motor vehicle fuels are vital to our economy. In fact, the Legislature has specifically concluded that the distribution and sale of motor fuels within this State is affected with a public interest. *N. J. S. A.* 56:6–19(c).

It is a fallacy to state that the right of termination is bilateral. The oil company can always get another person to operate the station. It is the incumbent dealer who has everything to lose since, even if he had another location to go to, the going business and trade he built up would remain with the old station.

The relationship between Shell and Marinello is basically that of franchise. The lease is an integral part of that same relationship. Our Legislature in enacting the Franchise Practices Act, has declared that distribution and sales through franchise arrangements in New Jersey vitally affect the general economy of the State, the public interest and the public welfare. *N. J. S. A.* 56:10–2. The Act prohibits a franchisor from terminating, cancelling or failing to renew a franchise without good cause which is defined as the failure by the franchisee to substantially comply with the requirements imposed on him by the franchise. *N. J. S. A.* 56:10–5.

The Act does not directly control the franchise relationship herein since Marinello's last renewal antedates the effective date of the statute. *N. J. S. A.* 56:10–8. However, the Act reflects the legislative concern over long-standing abuses in the franchise relationship, particularly provisions giving the franchisor the right to terminate, cancel or fail to renew the franchise. To that extent the provisions of the Act merely put into statutory form the extant public policy of this State. *Cf. In re Arens,* 41 *N. J.* 364, 384–387 (1964).

Even on this basis, Shell contends that it had good cause to serve notice of termination on Marinello. Its representa-

tives testified that Marinello did not keep the station in a neat, clean condition, and that frequent complaints to him about station appearance went unheeded. They also said that Marinello did not keep the station open the required period of hours, and that gasoline sales volume for the past three years had become stagnant.

Marinello, on the other hand, produced proof that the appearance of his station was good and the volume of gasoline pumped over the past three years was excellent for a neighborhood station. He said that his hours of operation since 1959 had been 6:30 A.M. to midnight. He asserted that he tried keeping open for 24 hours for a short while, but neighbors complained and Shell told him to stop. He attributed his present difficulties with Shell to his refusal to accede to Shell's request that he lower his price from 3¢ to 5¢ a gallon during an area "gas war." (Marinello said he would have had to absorb a loss from 2¢ to 4¢ a gallon.) He also said that he was told by the assistant district manager for Shell that one of the reasons his lease was not being renewed was he did not buy enough TBA.

The trial court found that Marinello had substantially performed his obligations in a satisfactory manner and had not given Shell any just cause to terminate the lease and franchise. The record amply supports this finding and conclusion. We will not disturb it.

We hold (1) that the lease and dealer agreement herein are integral parts of a single business relationship, basically that of a franchise, (2) that the provision giving Shell the absolute right to terminate on 10 days notice is void as against the public policy of this State, (3) that said public policy requires that there be read into the existing lease and dealer agreement, and all future lease and dealer agreements which may be negotiated in good faith between the parties, the restriction that Shell not have the unilateral right to terminate, cancel or fail to renew the franchise, including the lease, in absence of a showing that Marinello has failed to substan-

tially perform his obligations under the lease and dealer agreement, *i. e.*, for good cause, and (4) that good cause for termination has not been shown in this case.

Based on the foregoing, Marinello's franchise, including his lease, would have legal existence for an indefinite period, subject to his substantially performing his obligations thereunder. We are not called upon to decide whether the relationship is so personal it would not survive Marinello's disability or death. We also reserve the question of the particular remedy to which Marinello would be entitled (injunctive relief or compensatory damages) should Shell in good faith opt to operate the station itself.

The lease and dealer agreement, of course, would be subject to revision to conform with current Shell dealer operational practices for the area. The good faith of the parties and the reasonableness of their respective positions in the negotiations would determine the existence of good cause should the negotiations fail and Shell give notice of termination.

The judgment of the trial court is modified so as to conform with this opinion, and, as modified, is affirmed.

*For modification and affirmance*—Chief Justice WEINTRAUB, Justices JACOBS, PROCTOR, HALL, MOUNTAIN, SULLIVAN and GARVEN—7.

*For reversal*—None.