**BURGER KING CORPORATION, a Florida Corporation, Plaintiff-Appellee,**

v.

**Brian MACSHARA, Defendant,**

**John Rudzewicz, Defendant-Appellant.**

No. 82–5424.

United States Court of Appeals,
Eleventh Circuit.

Feb. 13, 1984.

Rehearing and Rehearing En Banc
Denied March 22, 1984.

Thomas H. Oehmke, Oehmke & Richardson, Detroit, Mich., for defendant-appellant.

Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, Joel S. Perwin, Miami, Fla., for plaintiff-appellee.

Before VANCE and JOHNSON, Circuit Judges, and PITTMAN *, District Judge.

VANCE, Circuit Judge:

In 1979, with the economy poised on the brink of recession, John Rudzewicz and Brian MacShara decided to purchase a Burger King restaurant franchise near Detroit, Michigan. This appeal, filed by Rudzewicz,[1] is the unforeseen outcome of their ill-timed venture.

Rudzewicz, a senior partner in a Michigan accounting firm, agreed to secure investment capital while MacShara was to handle day-to-day operations. MacShara's experience included stints as a supervisor in his father's Michigan construction firm and as a onetime assistant at a Burger King res-

---

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. MacShara has not appealed his judgment.

taurant. Both were and are residents and citizens of the state of Michigan.

The Burger King Corporation is incorporated in Florida and headquartered in Miami. The company maintains a district office in Birmingham, Michigan. During the course of negotiations, which lasted five months, the Michigan district office was Burger King's sole representative in dealings with Rudzewicz and MacShara. H.G. Hoffman, the Michigan district manager, evaluated their proposal and wrote them on the company's behalf to convey approval of their franchise application. Following lengthy discussions, Hoffman persuaded them to acquire an existing store in Drayton Plains, Michigan to avoid the higher rent that would be entailed if they insisted upon construction of a new building. He also convinced them to purchase and install $165,000 worth of equipment before the final rental charge had been computed.

At the conclusion of each round of Michigan negotiations, the Miami office mailed Rudzewicz printed documents for his signature. The documents, once signed, were returned to Burger King headquarters in Miami for completion.[2] Following corporate approval, headquarters then mailed Rudzewicz copies of the completed documents for his files.

After granting initial approval, Burger King decided to schedule the grand opening for May 31, 1979, the close of its fiscal year, to ensure that the sale appeared in the company's year-end statement. On May 29, the day the final agreements arrived for signature, Rudzewicz and MacShara finally learned what rent Burger King expected them to pay. The figure was far in excess of the amount Rudzewicz had projected.[3] He telephoned Hoffman and demanded a lower figure. According to Rudzewicz, Hoffman replied that the rent computation was out of his hands. If Rudzewicz was unwilling to accept the figure Burger King proposed, Hoffman continued, he was always free to decline the franchise, rip out the fixtures he had installed at his own expense, and resell them at a loss. On June 4 Rudzewicz and MacShara signed the lease and franchise agreements in their individual capacities at a Michigan closing ceremony attended by employees of the local district office.

In the lease agreement, Burger King agreed to lease the Drayton Plains store for a term of twenty years. Rent was set at a monthly minimum of $4,166.66 in the first two years and $5,286.58 thereafter or 8½% of monthly gross sales, whichever was greater.[4] The franchisees were required to remit rent, as well as royalties, tax refunds and other designated fees to Burger King headquarters in Miami.[5]

In return Burger King promised use of the Burger King mark, architectural advice, advertising services, financial counseling, and operations consultation. At trial, an executive from the Miami headquarters office testified that the Michigan district office was administratively responsible for all of the supervision, advertising and consultation due under the contract. With the exception of a Burger King University management course which MacShara attended in Florida and the Miami payment obligation, the contracts provided for no contact of any kind between the Florida headquarters and the franchisees.

---

2. The record does not identify who mailed the papers to Miami.

3. *See infra* note 4.

4. The lease called for minimum annual rent consisting of 13.4% of "construction costs." At trial, Rudzewicz testified that Michigan Burger King officials estimated construction costs would equal approximately $180,000. This figure was based on the costs of renovating the existing Drayton Plains facility.

   Rent calculated on a base of $180,000 would equal $2,010 a month. Rudzewicz boosted his projection to $2,500 to amortize the additional cost of original construction. Although he testified that Hoffman promised that the rent at Drayton Plains would be lower than that at a new facility, the rent that Burger King finally proposed was computed on a base equal to that estimated for newly constructed facilities. This testimony stands undisputed and uncontradicted.

5. Rudzewicz and MacShara signed equipment contracts containing similar provisions with the Davmore division of Burger King.

Within weeks of opening, the store had fallen behind in payments. Rescheduling negotiations broke down, and Burger King sued Rudzewicz and MacShara in diversity in the Southern District of Florida for breach of contract and trademark infringement. Defendants entered a special appearance to contest personal jurisdiction. After losing this motion, they filed a counterclaim seeking damages under the Michigan Franchise Investment Act.[6] A bench trial ensued and Judge Kehoe entered judgment for Burger King on both the contract claim and the counterclaim. Damages of $228,875.40 were assessed against defendants in their individual capacities. In addition, Burger King was awarded costs of $2,151.06 and $30,000 in attorneys fees.

On appeal, Rudzewicz contests his judgment for lack of personal jurisdiction as well as on substantive grounds. He further appeals the ruling on the counterclaim. Because we conclude that the trial court lacked personal jurisdiction over Rudzewicz, we do not reach the merits.

### I.

■ In a diversity case, a federal district court must exercise its jurisdiction in accordance with due process and the law of the state in which the court sits. *Bankhead Enterprises, Inc. v. Norfolk & Western Ry.,* 642 F.2d 802, 804 (5th Cir. Unit B 1981). Although Rudzewicz concedes that his activities fall within the reach of the Florida long-arm statute, Fla.Stat. § 48.193(1)(g),[7] he argues that invocation of that statute under these circumstances exceeds the bounds of due process.

■ No defendant can be compelled to answer in a state's courts unless minimum contacts exist among defendant, the forum state and the litigation such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Shaffer v. Heitner,* 433 U.S. 186, 203, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977); *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In deference to the sovereignty of the forum's sister states, due process requires "that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 293–94, 297, 100 S.Ct. 559, 565–66, 567, 62 L.Ed.2d 490 (1980); *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 159–60.

This case presents the question whether a Florida court can exercise jurisdiction over a non-resident purchaser by virtue of his contract with a Florida corporation obligating him to remit payments to Miami. This is a subtle and difficult problem. As Mr. Justice White has noted, "the question of personal jurisdiction over a nonresident corporate defendant based on contractual dealings with a resident plaintiff," a question which applies *a fortiori* to individual defendants, "has deeply divided the federal and state courts." *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.,* 445 U.S. 907, 909, 100 S.Ct. 1087, 1089, 63 L.Ed.2d 325 (1980) (White, J., joined by Powell, J., dissenting from denial of certiorari); *see also Baxter v. Mouzavires,* 455 U.S. 1006, 102 S.Ct. 1643, 71 L.Ed.2d 875 (1982) (White, J., joined by Powell, J., dissenting from denial of certiorari); *Chelsea House Publishers v. Nicholstone Book Bindery, Inc.,* 455 U.S. 994, 102 S.Ct. 1623, 71 L.Ed.2d 856 (1982) (White, J., joined by Burger, C.J. and Powell, J., dissenting from denial of certiorari). *Cf. Lakeside Bridge & Steel Co. v. Mountain State Construction Co.,* 597 F.2d 596, 601–02 & n. 9 (7th Cir.

---

**6.** Mich.Comp.Laws Ann. § 445.1501 *et seq.*

**7.** That section reads:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits that person and, if he is a natural person, his personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following:

.    .    .    .    .

(g) Breaches a contract in this state by failing to perform acts required by the contract to be performed in this state.

1979). Mindful of this confusion and the continuing uncertainty as to the meaning of *Hanson v. Denckla* and its progeny, we focus our analysis on the guidelines set forth in Supreme Court precedent and the case law of this circuit.

## II.

Due process restrictions "are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States." *Hanson v. Denckla,* 357 U.S. at 251, 78 S.Ct. at 1238. Hence, the minimum contacts measure is not a question of "a little more or a little less. Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to" the laws of the forum state. *International Shoe,* 326 U.S. at 319, 66 S.Ct. at 160. A state cannot justifiably assert jurisdiction over an individual with whom it has no constitutionally cognizable contacts or ties. *World-Wide Volkswagen,* 444 U.S. at 294, 100 S.Ct. at 565–66.

The *Hanson* requirement of purposeful activity within the forum state reflects two contrasting considerations. Particularly in the commercial context, fairness dictates that a defendant who derives profits from deliberate contacts within the forum state should be responsible for the costs such activities incur. On the other hand, due process abhors the unfair surprise that results when a party is haled into court in a state with which he lacks deliberate connections. *World-Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567; *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 496 (5th Cir.1974).

The interplay of these considerations—responsibility and preparedness—can plainly be seen in the leading Supreme Court cases of *Shaffer v. Heitner, World-Wide Volkswagen,* and *McGee v. International Life*

Insurance Co. In *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), plaintiff predicated Delaware jurisdiction in part on the fact that defendants had accepted directorships in Greyhound, Inc., a corporation chartered in Delaware but headquartered in Arizona. Reasoning that directorial appointment in and of itself did not notify defendants that they risked being sued in the state of formal incorporation, the Court concluded that they had not purposefully availed themselves of the opportunity to conduct activities in the state of Delaware so as to confer jurisdiction there. 433 U.S. at 216, 97 S.Ct. at 2586. Three years later, the Court further restricted the scope of personal jurisdiction. In *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the Court denied jurisdiction over a suit arising from an automobile accident in the forum state of Oklahoma, reasoning that the local New Jersey car dealer who sold plaintiff the car could not have expected that the sale might give rise to products liability litigation halfway across the country. 444 U.S. at 297–98, 100 S.Ct. at 567–68.

*McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), reached the opposite outcome on the basis of slender contacts which nevertheless left the defendant prepared for the possibility of out-of-state litigation. In that case, the Texas successor to a defunct life insurance company wrote Franklin, a California resident, offering to reinsure the policy he held from its predecessor. Franklin accepted the offer and commenced mailing premiums from California to Texas. After Franklin died, the insurer refused to honor the policy. Franklin's beneficiary sued in California state court. Despite the scant contacts between the company and the forum state, the Court concluded that jurisdiction was properly asserted.[8] The defend-

---

8. In reaching its conclusion, the Court noted that California had an interest in affording redress to California residents when out-of-state insurers refused to honor their claims. The Court accorded that interest substantial weight because the prohibitive costs of distant litigation otherwise would force many claimants to forgo worthwhile claims. 355 U.S. at 223, 78

S.Ct. at 201. Where a party claiming breach of contract can afford to sue outside of the forum state, as here, the state interest in redress is correspondingly weak. *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 498 n. 27 (5th Cir.1974). *Cf. Lakeside Bridge & Steel Co.,* 597 F.2d at 602 n. 11 ("The forum state has a lesser

ing insurer had derived profit from the California market by soliciting revenue from one of its residents. *Hanson,* 357 U.S. at 251–52, 78 S.Ct. at 1238–39. By virtue of its direct mail offer, furthermore, the insurer had reason to know that its business dealings brought it into contact with the forum state and it could adjust its premiums accordingly to reflect the added financial risk of litigation. *See World-Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567.

In contrast with their typical ease in reconciling jurisdiction over non-resident sellers, courts have encountered particular difficulties in applying *Hanson's* requirement of purposeful activity to suits against non-resident buyers. *In-Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 232–33 (6th Cir.1972). In part this reflects a judgment that the activity of incurring a debt with an in-state seller, however purposeful, is not an activity which occurs in the seller's state. *See Lakeside Bridge & Steel Co.,* 597 F.2d at 601–04. The geographical location of activities such as debt incurrence cannot provide a workable basis for determining whether jurisdiction is fair in any given circumstance. A rule which would require determining the geographical origin of a given debt would in our mind unwisely revive the effort to pinpoint the situs of intangibles which in rem jurisdiction entailed. The often metaphysical character of this inquiry in the context of in rem jurisdiction justifiably led the Supreme Court to abandon it in favor of the functional test of fairness enunciated in *International Shoe. See Shaffer v. Heitner,* 433 U.S. at 212, 97 S.Ct. at 2584.

We recognize, of course, that there are many circumstances in which a buyer fairly can be held to account in a foreign jurisdiction for the debts he has incurred. While the stereotypical image of buyers as the passive recipients of sellers' attentions assumes that buyers lack notice of the seller's residence and financial resources to defend suit there, *In-Flight Devices Corp.,* 466 F.2d at 233; Currie, *The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois,* 1963 U.Ill.L.F. 574, 576, this assumption is not always true. Some buyers can demand terms; others must accede to them. Thoughts of profit motivate some orders; more personal desires impel others. Purchases may involve large amounts or small, a single transaction or many. The buyer may be a local business or an interstate concern, ordering directly from the seller's headquarters or solely through the local hometown agent.

This array of considerations complicates efforts to adjudicate such jurisdictional challenges in a reasoned and coherent manner. We believe, however, that the crux of the distinction between passive and active buyers stems from a concern for unfair surprise, both in terms of reasonable notice and financial preparedness. Mail-order customers, for example, probably would not expect to be subject to suit in a foreign jurisdiction and often would not find it financially worthwhile to defend an action there. We therefore agree with other jurists and commentators who have noted the unfairness of asserting jurisdiction over out-of-state customers to collect payments due on modest personal purchases. *Baxter v. Mouzavires,* 455 U.S. at 1006, 102 S.Ct. at 1643; *In-Flight Devices Corp.,* 466 F.2d at 232; Currie, *supra,* at 574–77. *Cf. Rush v. Savchuk,* 444 U.S. 320, 329, 100 S.Ct. 571, 577–78, 62 L.Ed.2d 516 (1980) (insured not expected to defend suit in every state where insurer does business). A contrary result would sanction suit against mail-order customers in the home office's state even though they had never set foot there and even though the price they paid could not be lowered to reflect the risk of suit. Consumers would inevitably suffer a spate of default judgments if defense of small claims required a cross-country trek whose costs exceeded the expense of judgment itself. *McGee,* 355 U.S. at 223, 78 S.Ct. at 201. Counsel for *Burger King* agrees that such an outcome would be fundamentally unfair.

interest in protecting a corporation in an interstate contract dispute, especially when the corporation left the state to solicit and secure the contract, because the effects of a commercial contract are unlikely to involve danger to persons or things within the state's borders.").

Our concern for adequate notice and fairness to buyers does not of course necessitate a broad rule immunizing purchasers generally from suit in the seller's home state. Where commercial parties of comparable bargaining strength contract for performance of manufacturing or services within that state's bounds, we have consistently held that jurisdiction comports with due process, even if negotiations occur elsewhere. *Standard Fittings Co. v. Sapag, S.A.,* 625 F.2d 630, 644–45 (5th Cir.1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1981, 68 L.Ed.2d 299 (1981); *Gold Kist Inc. v. Baskin-Robbins Ice Cream Co.,* 623 F.2d 375, 382 (5th Cir.1980); *Southwest Offset, Inc. v. Hudco Publishing Co.,* 622 F.2d 149, 152 (5th Cir.1980) (per curiam); *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483 (5th Cir.1974). *But see Lakeside Bridge & Steel v. Mountain State Construction Co.,* 597 F.2d 596 (7th Cir.1979), *cert. denied,* 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980). In short, the principle of fairness which is the essence of due process must be the compass which guides our inquiry.

We recognize that this case, in aspects, resembles commercial transactions which properly give rise to jurisdiction. Rudzewicz and MacShara were two Michigan entrepreneurs eager for the profits a franchise could promise. They signed contracts calling for payments exceeding $1 million over the life of the venture. Despite the expense of the transaction and its commercial end, however, we are troubled by elements of surprise which, if sanctioned, could ultimately sow the seeds of default judgments against franchisees owing smaller debts.

Nothing in the course of the negotiations gave Rudzewicz reason to anticipate a Burger King suit outside of Michigan. The only face-to-face or even oral contact Rudzewicz had with Burger King throughout months of protracted negotiations was with representatives of the Michigan office.

Burger King had the Michigan office interview Rudzewicz and MacShara, appraise their application, discuss price terms, recommend the site which the defendants finally agreed to, and attend the final closing ceremony. There is no evidence that Rudzewicz ever negotiated with anyone in Miami or even sent mail there during negotiations. He maintained no staff in the state of Florida, and as far as the record reveals, he has never even visited the state.

The contracts contemplated the startup of a local Michigan restaurant whose profits would derive solely from food sales made to customers in Drayton Plains. The sale, which involved the use of an intangible trademark in Michigan and occupancy of a Burger King facility there, required no performance in the state of Florida. Under the contract, the local Michigan district office was responsible for providing all of the services due Rudzewicz, including advertising and management consultation. Supervision, moreover, emanated from that office alone. To Rudzewicz, the Michigan office was for all intents and purposes the embodiment of Burger King. He had reason to believe that his working relationship with Burger King began and ended in Michigan, not at the distant and anonymous Florida headquarters.[9] *See* Brilmayer, *How Contacts Count: Due Process Limitations on State Court Jurisdiction,* 1980 S.Ct.Rev. 77, 89–90; Comment, *Constitutional Limits on State Long Arm Jurisdiction,* 49 U.Chi.L. Rev. 156, 167 n. 56 (1982).

Given that the office in Rudzewicz' home state conducted all of the negotiations and wholly supervised the contract, we believe that he had reason to assume that the state of the supervisory office would be the same state in which Burger King would file suit. Rudzewicz lacked fair notice that the distant corporate headquarters which insulated itself from direct dealings with him would later seek to assert jurisdiction over him in the courts of its own home state.[10]

9. This case bears a resemblance to *Arthur, Ross & Peters v. Housing, Inc.,* 508 F.2d 562 (5th Cir.1975) (adopting the opinion of the district court). Defendant, a North Carolina realtor, persuaded plaintiff, a Texas partnership, to purchase land in North Carolina. A lawsuit later ensued in Texas federal court. We agreed

that the trial court lacked jurisdiction since performance of the contract was to occur entirely outside Texas borders. *Id.* at 565. *See also Hamilton Brothers, Inc. v. Peterson,* 445 F.2d 1334, 1336–37 (5th Cir.1971).

10. Burger King asserts that actual notice was provided by contractual provisions establishing

We believe that this is one of those cases where "there is something to the notion that a party who has gone into a foreign State to do business with one of its residents can be expected to go back to bring suit." Currie, *supra*, at 574.[11]

Just as Rudzewicz lacked notice of the possibility of suit in Florida, he was financially unprepared to meet its added costs. The franchise relationship in particular is fraught with potential for financial surprise. The device of the franchise gives local retailers the access to national trademark recognition which enables them to compete with better-financed, more efficient chain stores. This national affiliation, however, does not alter the fact that the typical franchise store is a local concern serving at best a neighborhood or community. Neither the revenues of a local business nor the geographical range of its market prepares the average franchise owner for the cost of distant litigation. *Cf. In-Flight Devices Corp.,* 466 F.2d at 234 (a business that lacks substantial out-of-state sales may be financially unprepared to defend suit outside of its home base). In *World-Wide Volkswagen,* for example, the Court held a local car dealer immune from suit despite its participation in a nationwide servicing plan. The Court reached this conclusion because, in part, the limited range of the retailer's market was unconducive to insuring against the cost of defending an out-of-

state personal injury suit. 444 U.S. at 297–98, 100 S.Ct. at 567–68. The same consideration militates against jurisdiction in this case.

The particular distribution of bargaining power in the franchise relationship further impairs the franchisee's financial preparedness. In a franchise contract, "the franchisor normally occupies [the] dominant role . . ." Annot., 67 A.L.R.3d 1299, 1302 (1975). *See, e.g., Shell Oil Co. v. Marinello,* 63 N.J. 402, 307 A.2d 598, 67 A.L.R.3d 1291 (1973), *cert. denied,* 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974). In recent years, certain states, including Michigan, have moved to enact statutes to police the more flagrant excesses of franchises. Annot., 67 A.L.R.3d at 1301.

We discern a characteristic disparity of bargaining power in the facts of this case. There is no indication that Rudzewicz had any latitude to negotiate a reduced rent or franchise fee in exchange for the added risk of suit in Florida.[12] He signed a standard form contract whose terms were non-negotiable and which appeared in some respects to vary from the more favorable terms agreed to in earlier discussions. In fact, the final contract required a minimum monthly rent computed on a base far in excess of that discussed in oral negotiations. Burger King resisted price concessions, only to sue Rudzewicz far from home.[13] In doing so, it severely impaired his ability to call Michi-

---

that Florida was the state of the contract and that its choice-of-law rules would govern. We doubt, however, that boilerplate declarations in a lengthy printed contract suffice to provide actual notice of suit. In addition, *Hanson v. Denckla* established that the center of gravity for choice-of-law purposes does not necessarily confer the sovereign prerogative to assert jurisdiction. 357 U.S. at 254, 78 S.Ct. at 1240.

11. In reaching this conclusion, we find support in *Shaffer v. Heitner.* Defendants in both cases were sophisticated businessmen who had reason to understand that they were entering into a business relation with a corporation chartered in the forum state. Yet in each case it was reasonable to assume that all working contact with the corporation would emanate from another state—in *Shaffer,* from corporate headquarters in Arizona; in this case, from the district office in Birmingham, Michigan.

12. *See supra* note 4. Following protests on Rudzewicz' part, Burger King reduced the monthly minimum rent for the third year of the contract from $5,286.58 to $4,416.66. The reduction represented savings of $10,439.04. While sizable, this amount pales against the $641,900 disparity between the total rent Rudzewicz expected to pay and the amount Burger King charged.

13. We note that several Burger King franchisees have challenged personal jurisdiction in Florida courts without success. *See Burger King Corp. v. Elliott,* No. 80–2694–CIV–EBD (S.D.Fla. Jan. 9, 1981); *Burger King Corp. v. Wagner,* No. 80–942–CIV–EBD (S.D.Fla. July 16, 1980); *Burger King Corp. v. Robinson,* No. 79–5824–CIV–EPS (S.D.Fla. May 30, 1980); *Burger King Corp. v. Snow,* No. 80–295–CIV–SMA (S.D.Fla. March 18, 1980); *Burger King Corp. v. Levine,* No. 80–5852(08) (Cir.Ct.Fla. July 21, 1980).

gan witnesses who might be essential to his defense and counterclaim.[14]

In sum, we hold that the circumstances of the Drayton Plains franchise and the negotiations which led to it left Rudzewicz bereft of reasonable notice and financially unprepared for the prospect of franchise litigation in Florida. Jurisdiction under these circumstances would offend the fundamental fairness which is the touchstone of due process. We therefore reverse the judgment and remand with directions to vacate the judgment and dismiss the case.

REVERSED and REMANDED.

JOHNSON, Circuit Judge, dissenting:

I dissent from the decision of the majority that appellant did not have sufficient minimum contacts with the state of Florida to support the exercise of personal jurisdiction by a federal district court sitting in diversity. To decide whether the exercise of jurisdiction comports with the requirements of due process, this Court must determine whether the defendant "has purposefully availed himself of the benefits and protection of the forum state's laws, whether the forum state has any special interest in exercising jurisdiction, and whether the convenience of the parties favors litigating in another state." *Austin v. North American Forest Products,* 656 F.2d 1076, 1089 (5th Cir.1981) (citing *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483 (5th Cir.1974)).[1]

This Court has recognized that the purposeful availment prong of the *Product Promotions* test may be satisfied even if the defendant performs no physical acts within the forum state, as long as his contacts with the forum were " 'deliberate, rather than

fortuitous, so that the possible need to invoke the benefits and protections of the forum's laws was reasonably foreseeable, if not foreseen, rather than a surprise'." *Austin, supra,* at 1089–90 (quoting *Product Promotions, supra,* at 496) (footnotes omitted). In *Marathon Metallic Building Co. v. Mountain Empire Construction Co.,* 653 F.2d 921 (5th Cir.1981) (per curiam), the Court determined that the purposeful availment prong was satisfied when the defendant entered a contract that specifically provided that it would be governed by the laws of the forum state. *Id.* at 923. In this case, both the franchise agreement and the lease signed by appellant and Burger King specifically provided that the laws of Florida would govern their interpretation. Thus, appellant has purposefully availed himself of the benefits and protections of Florida's laws.

The forum state has a special interest in exercising jurisdiction when the contract in dispute calls for the application of the forum state's laws. *See Marathon, supra,* at 923 (forum has interest when contract requires application of forum's laws); *Product Promotions, supra,* at 498 (forum has interest when its laws will be "of some relevance in resolving the suit"). Thus, Florida here has a special interest in exercising jurisdiction over appellant.

Finally, no great imbalance of convenience here argues for one forum over the other. Appellant cannot successfully argue that, because a large corporation sues him as an individual, the inconvenience to him can defeat personal jurisdiction. *See Marathon, supra,* at 923.

---

**14.** Burger King urges us to impute MacShara's matriculation at Burger King University to Rudzewicz for purposes of minimum contacts. The company reasons that the ties of one partner can be attributed to all partners for suits arising out of their common ventures. We need not decide that question here, however, since Rudzewicz and MacShara never formed a partnership. They signed the agreements in their individual capacities. We conclude that contacts cannot be attributed from one individual defendant to another because "[t]he requirements of *International Shoe* ... must be

met as to *each* defendant over whom a state court exercises jurisdiction." *Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571, 579, 62 L.Ed.2d 516 (1980) (emphasis added).

**1.** The Eleventh Circuit Court of Appeals has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, as its governing body of precedent, which is binding unless and until overruled or modified by this Court en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

Ignoring this binding precedent, the majority opinion questions whether appellant had reasonable notice of the possibility that he would be haled into court in Florida and whether he was adequately prepared for that contingency, and it warns that a determination that jurisdiction exists in this case may mean that consumers, nonresident purchasers whom the majority likens to appellant, also will be subjected to the jurisdiction of foreign courts simply because they have purchased goods under contracts requiring them to remit payment to the foreign state. In raising this specter, the majority does not give proper weight to the recognized fact that appellant was a senior partner in a Michigan accounting firm, who for five months conducted negotiations with Burger King over the terms of the franchise and lease agreements, and who obligated himself personally to contracts requiring over time payments that exceeded $1 million. Appellant, who clearly does not resemble the average consumer, signed contracts that explicitly provided that Florida law would govern their interpretation. He therefore had reasonable notice of the possibility that he would be sued under the contracts in the state of Florida, and he should have been adequately prepared for that contingency.