951 P.2d 897

**CONSUMERS INTERNATIONAL, INC., an Arizona corporation, Plaintiff–Appellant,**

v.

**SYSCO CORPORATION, a foreign corporation, Defendant–Appellee.**

No. 1 CA–CV 97–0086.

Court of Appeals of Arizona, Division 1, Department B.

Dec. 30, 1997.

As Amended Jan. 6, 1998.

Warnock, MacKinlay & Associates, P.L.L.C. by J. Kent MacKinlay, Mesa, for Plaintiff–Appellant.

Johnston Maynard Grant & Parker, P.L.C. by Daniel D. Maynard, Phoenix, for Defendant–Appellee.

## OPINION

VOSS, Judge.

Plaintiff-Appellant Consumers International, Inc. (CI) appeals from the trial court's judgment in favor of Defendant–Appellee Sysco Corporation (Sysco) on CI's claim of

wrongful termination of the parties' business relationship. The sole issue on appeal is whether the implied covenant of good faith and fair dealing inherent in every contract requires that a termination-at-will clause in a distribution agreement be interpreted to require "good cause." Because we conclude that the contract contained no such requirement, and that the trial court correctly entered summary judgment on this basis, we affirm.

### Facts and Procedural History

The parties entered into a written "Master Distribution Agreement" on October 1, 1993. The agreement provided that Sysco would serve as supplier of at least eighty percent of the enumerated food service products that CI distributed to its retail customers. The products included both national brands and Sysco brands.

The agreement provided as follows regarding its duration:

9. Term

The term of this Agreement will begin on October 1, 1993, and terminate two years from that date. This Agreement may be terminated prior to such date.

(a) By either party upon thirty (30) days written notice to the other party for failure of the other party to comply with any provision of this Agreement;

(b) By SYSCO upon written notice to Customer if Customer's financial position deteriorates materially, determined by SYSCO in its sole judgment; and

(c) **By either party upon sixty (60) days prior written notice to the other party.**

(Emphasis added.) On December 13, 1993, Sysco sent the following termination letter to CI, indicating its sixty-day notice:

This letter is to serve as notification to Consumers International that SYSCO Corporation, and its operating subsidiaries and divisions, is hereby terminating our Master Distribution Agreement with Consumers International.

The Master Distribution Agreement will therefore terminate sixty days hence, being February 12, 1994.

In August 1995, CI brought this action against SYSCO, alleging, among other things,[1] wrongful termination of the contract based on Sysco's breach of the implied covenant of good faith and fair dealing. CI contended that the agreement implicitly contained an "implied covenant that the right of termination would only be exercised in good faith."

Sysco moved for summary judgment on this claim, asserting that it had the right to terminate the contract for any reason upon sixty days notice, under the explicit terms of the agreement. The trial court agreed and found:

THE COURT FINDS that the parties dealt at arms['] length.

THE COURT FURTHER FINDS that the parties had benefit of counsel when they entered into the contract.

THE COURT FURTHER FINDS that the parties were aware of paragraph 9(c) permitting termination of the contract without cause by the Defendant.

THE COURT FURTHER FINDS no evidence of bad cause such as gender discrimination[,] racial discrimination or violation of public policies [as] in *Wagenseller v. Scottsdale Memorial Hospital* [,] 147 Ariz. 370, 710 P.2d 1025 (1985).

Based on these findings, the trial court granted Sysco summary judgment on the claim of wrongful termination of contract, and concluded that the agreement terminated on February 12, 1994. After the parties stipulated to the remaining issues, the court dismissed the action, and CI timely appealed from the final judgment.

### DISCUSSION

On appeal, CI contends that the implied covenant of good faith and fair dealing inherent in every contract mandates that early termination of a distribution agreement be

---

1. The other counts of the complaint were dismissed by the trial court and are not issue in this appeal.

restricted to reasons constituting "good cause." Because Sysco has not given any "good cause" reason for early termination of this contract, CI contends that summary judgment was inappropriate on its wrongful termination claim.

■ As a preliminary matter, we note that CI asserts that its relationship with Sysco is "akin" to that of a franchisee. Much of the case law on which CI relies involves franchise relationships. We need not, however, determine whether this distribution agreement constituted a "franchise" [2] to resolve this issue; even assuming, without deciding, that the business relationship at issue here was a franchise-type relationship, our conclusion would be the same.

CI contends that, because it is a small distributor and Sysco is a large supplier, the contractual relationship between them must be viewed as an unequal one, and that public policy therefore compels limiting enforcement of the broad termination clause to good cause. CI finds support for this argument in the common law of Arizona and other jurisdictions and in analogous Arizona statutory provisions relating to supplier/dealer relationships of oil companies and liquor suppliers.

■ We begin with the premise that, under general principles of contract law, absent statutory regulation, parties may freely contract for any lawful purposes, including franchise agreements for the distribution of products. *McDonald's Corp. v. Markim, Inc.,* 209 Neb. 49, 306 N.W.2d 158, 162 (1981). Freedom to contract has long been considered a valuable right:

> [I]f there is one thing which more than another public policy requires it is that [people] of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider—that

you are not lightly to interfere with this freedom of contract.

*Wood Motor Co. v. Nebel,* 150 Tex. 86, 238 S.W.2d 181, 185 (1951) (citation omitted).

This general rule has been modified by Arizona courts in some limited circumstances, however, when enforcement of contractual terms may be either unconscionable because of the unequal bargaining power of the parties, *see Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.,* 140 Ariz. 383, 682 P.2d 388 (1984), or contravene public policy, see *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 710 P.2d 1025 (1985).

The Arizona Legislature has also statutorily modified the freedom to contract in certain limited types of franchise relationships. *See, e.g.,* A.R.S. §§ 44–1551 to 1562 (Petroleum Products Franchises); A.R.S. §§ 44–1565 to 1567 (Spiritous Liquor Franchises); A.R.S. § 28–1301 to 28–1329 (Automobile Dealers and Wreckers). Unlike many other states, however, our legislature has not statutorily regulated the termination of all franchise contracts. *Cf., e.g.,* Conn. Gen.Stat. Ann. §§ 42–133f and –133l(a); Delaware Franchise Security Law, 6 Del.Code § 2551 *et seq.*; Nebraska Franchise Practices Act, Neb.Rev.Stat. §§ 87–401 *et seq.*; New Jersey Franchise Practices Act, N.J. Stat. Ann. 56:10–1 to 10–8; Washington Franchise Protection Act, Wash. Rev.Code 19.100.180.

We begin our analysis with an examination of the common law of other jurisdictions on the specific issue of franchise no-cause termination agreements, and then turn to existing general Arizona contract law to resolve this issue.

### Other Jurisdictions

Many of the common law cases cited by CI in the area of "good-cause" termination developed in the 1970s during a shortage of oil supplies in the United States. During that economic crisis, many courts began to limit

---

**2.** The definition of "franchise" varies widely from state to state, and is not consistent throughout the case law cited by the parties. One important aspect that is consistent, however, is that a "franchise" is distinguished by "the distribu-

tion of goods or services under the trademark of the franchisor." *See generally* Erwin S. Barbre, J.D., *Validity, Construction, and Effect of State Franchising Statute,* 67 A.L.R.3d 1299, 1304 (1975 & Supp. Aug. 1997).

the enforcement of contractual termination rights between large oil companies and their smaller retail dealers by construing distribution contracts to include an inherent requirement that the contract not be terminated except for "good cause." *See, e.g., Shell Oil v. Marinello*, 63 N.J. 402, 307 A.2d 598, 602 (1973)(public policy of state implies a covenant not to terminate franchise agreement except for "just cause"); *Ashland Oil v. Donahue*, 159 W.Va. 463, 223 S.E.2d 433, 440 (1976)(holding unenforceable an oil dealer's right to terminate); *Atlantic Richfield v. Razumic*, 480 Pa. 366, 390 A.2d 736, 742 (1978)(adopting *Marinello* reasoning to limit termination clause for public policy reasons). These courts based termination clause limitations on common law public policy concerns reflected in recent enactments of state legislation regulating either the petroleum industry specifically or franchise arrangements in general. For example, in *Marinello*, the court noted the New Jersey Legislature's recent enactment of the Franchise Practices Act, which "prohibits a franchisor from terminating, canceling or failing to renew a franchise without good cause which is defined as the failure by the franchisee to substantially comply with the requirements imposed on him by the franchise." 307 A.2d at 602, *see* N.J. Stat. Ann. 56:10–2. Although the statute did not apply retroactively to the *Marinello* contract, the court found this legislative regulation to reflect the "public policy" of the state:

> [T]he Act reflects the legislative concern over long-standing abuses in the franchise relationship, particularly provisions giving the franchisor the right to terminate, cancel or fail to renew the franchise. To that extent the provisions of the Act merely put into statutory form the extant public policy of this State.

*Id.* Thus, the court found void as against public policy a termination clause in a dealer agreement that gave Shell Oil Corporation the "absolute" right to terminate on ten days notice. *Id.*

Similarly, other courts have concluded that when parties to a "chain-style" franchise agreement do not expressly provide for termination without cause, the contract is interpreted to include a "good cause" termination requirement. *See Seegmiller v. Western Men, Inc.*, 20 Utah 2d 352, 437 P.2d 892, 894 (1968). Courts have also refused to enforce unilateral termination provisions based on the supplier's sole judgment that the dealer has impaired the supplier's good will. *Ashland Oil v. Donahue*, 159 W.Va. 463, 223 S.E.2d 433, 440 (1976). Additionally, courts have found implicit in a franchise contract for a term of years the "reasonable expectation," under "principles of good faith and commercial reasonableness," that the supplier will not arbitrarily or summarily terminate the franchise agreement. *Atlantic Richfield v. Razumic*, 480 Pa. 366, 390 A.2d 736, 742 (1978).

As more states enacted laws regulating these business relationships, including franchises, such distribution agreements were frequently interpreted to include a "good cause" requirement for termination, basically requiring some act of default or wrongdoing on the part of the franchisee to enable the franchisor to assert its termination power. *See generally* Timothy H. Fine, *Recent Developments in State Law Affecting Franchising*, 1980 Ariz. St. L.J. 547 (1980). However, some courts were careful to limit the application of the "good cause" termination requirement to situations containing the following factors: (1) the existence of a true franchise-type relationship, regardless of the name placed on it, because of the concern of the unequal bargaining powers of the parties in such a relationship, and (2) the non-existence of an explicit provision allowing termination without cause. *Id.* at 554, *see also Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 81 Ill. Dec. 156, 169, 466 N.E.2d 958, 971 (1984) (discussing "judicial concern over longstanding abuses in franchise relationships"); *Witmer v. Exxon*, 260 Pa.Super. 537, 394 A.2d 1276, 1285 (1978), *affirmed*, 495 Pa. 540, 434 A.2d 1222 (1981)("This is unlike *Razumic* where the leases did not explicitly reserve a right to terminate the franchise without cause. The Court in *Razumic* thought the absence of such a provision was significant, if not crucial to their decision").

█ Not all jurisdictions followed this trend to imply a "good cause" termination

requirement in a franchise contract. Some courts refused to equate "good cause" with "good faith," finding no breach of the covenant of good faith and fair dealing in a no-cause termination provided for by the explicit terms of the contract. *McDonald's Corp. v. Markim,* 209 Neb. 49, 306 N.W.2d 158, 163 (1981); *Witmer v. Exxon,* 394 A.2d at 1285; *Gianelli Distributing Co. v. Beck & Co.,* 172 Cal.App.3d 1020, 219 Cal.Rptr. 203, 209 (1985). In *Witmer,* for example, the court reasoned that the existence of a no-cause termination clause in a contract was relevant to determine the *Razumic* standards of good faith and commercial reasonableness to protect the "reasonable expectations" of the franchisee in maintaining his franchise:

> Where there is no explicit termination clause . . ., a franchisee indeed has a reasonable expectation that the relationship will not be terminated arbitrarily without cause. However, when the actions of the franchisor are within plain and explicit enabling clauses of the lease, we find it impossible to say that the reasonable expectations of the franchisee have been violated.

394 A.2d at 1285. Likewise, in *Gianelli,* the court concluded that the covenant of good faith and fair dealing did not require a good cause termination requirement be applied as a matter of law, for the following reasons:

> [C]ases carefully limit application of the covenant of good faith and fair dealing [to termination clauses] to situations in which there is a special relationship due to unequal bargaining power or a special element of reliance, whereas in an ordinary business contract where these special circumstances do not exist, we believe the covenant cannot be applied to specially protect one party by requiring cause for termination.

219 Cal.Rptr. at 209. *See also Triangle Mining Co. v. Stauffer Chem. Co.,* 753 F.2d 734 (9th Cir.1985):

> [Courts] have implied a covenant of good faith in situations involving the termination of employment contracts, insurance contracts, and—sometimes—franchise or dealership arrangements. Where there exists no special element of reliance or unequal

bargaining power, however, courts generally conclude that "[w]hen the right to terminate the contract is absolute under the clear wording of the agreement the motive of the party in terminating such an agreement is irrelevant to the question of whether the termination is effective." [Citation omitted]

*Id.* at 740. Thus, the implied covenant of good faith and fair dealing "in and of itself" does not require "good cause" for termination of a franchise contract. *Gianelli,* 219 Cal.Rptr. at 209.

Other cases have refused to find franchise no-cause termination clauses either against public policy or unconscionable. *See McArtor v. Mobil Oil,* 212 Neb. 592, 324 N.W.2d 399, 400 (1982)(termination clause not against public policy); *Zapatha v. Dairy Mart, Inc.,* 381 Mass. 284, 408 N.E.2d 1370, 1376 (1980)(clause authorizing franchisor to terminate without cause on 90 days notice not unconscionable under principles in Article 2 of UCC); *Smith v. Price Creameries,* 98 N.M. 541, 650 P.2d 825, 829 (1982)(no-cause termination clause neither unconscionable nor in bad faith); *Home Reader Service v. Grappi,* 446 S.W.2d 95, 98 (Tex.Civ.App. 1969)("[a] contract provision for termination by either party 'when fairly entered into, will be enforced if not contrary to equity and good conscience' "); *Augusta Medical Complex, Inc. v. Blue Cross of Kansas,* 227 Kan. 469, 608 P.2d 890, 896 (1980)("[w]hen the right to terminate a contract is absolute under the clear wording in the agreement the motive of a party in terminating such an agreement is irrelevant to the question of whether the termination is effective"); *see also Cornitius v. Wheeler,* 276 Or. 747, 556 P.2d 666, 670 (1976)(lack of renewal provision in gas station lease not unconscionable); *Wood Motor Co. v. Nebel,* 150 Tex. 86, 238 S.W.2d 181, 185 (1951)("just cause" not required for termination of car dealer contract where contract unambiguously provided for no-cause termination).

A common thread in these cases is that an implied "good cause" requirement will not be imposed on a distribution agreement in situations where bargaining power exists for both parties, where the contract contains an ex-

plicit "no-cause" termination provision of which the parties were aware when entering the contract, or where no evidence of bad faith termination is otherwise established. As discussed below, all of those factors apply to the distribution agreement at issue in this case.

### Arizona Common Law

Arizona has not adopted a franchise regulation act analogous to those relied on in the decisions of many other jurisdictions to reflect the public policy of the state. Rather, our legislature has seen fit to regulate termination of such business relationships only in the areas of petroleum and liquor distribution and automobile dealers and wreckers. See A.R.S. § 44–1554 (prohibiting termination of a petroleum products franchise without "good cause"); A.R.S. § 44–1566 (requiring "good faith" and "good cause" to terminate a liquor franchise); A.R.S. § 28–1304.02(A)(prohibiting termination of auto dealer or wrecker franchise without "good cause"). We therefore need not engage in the "public policy" argument that other state courts have found compelling based on emerging legislation. We are also aware of the inherent dangers in declaring "public policy" in an area the legislature has not regulated:

> [C]ourts should proceed cautiously if called on to declare public policy absent some prior legislative or judicial expression on the subject.

Wagenseller v. Scottsdale Memorial Hosp., 147 Ariz. 370, 379, 710 P.2d 1025, 1034 (1985), quoting Parnar v. Americana Hotels, 65 Haw. 370, 652 P.2d 625, 631 (1982). We thus decline CI's invitation to find a "good cause" termination requirement in a franchise agreement as a matter of "public policy" based on the legislature's regulation in certain other industries. As the trial court aptly noted in this case, the legislature has regulated business relationships in the limited areas about which it was concerned; had it intended to include all franchise agreements within that statutory structure, it could have done so.

Instead, we look to Arizona common law as set forth in court decisions. In Wagenseller,

our supreme court recognized a common law "public policy" exception to the termination at-will doctrine in an employment context, holding that an "at-will" employee may be fired for good cause or for no cause, "but not for bad cause—that which violates public policy." 147 Ariz. at 378, 710 P.2d at 1033. The court found Arizona's public policy "is articulated in our state's constitution and statutes, as embodiment of 'the public conscience of the people of this state,'" as well as in the decisions of our courts. Id. at 378, 379, 710 P.2d at 1033, 1034 (citation omitted). The court limited the public policy exception to apply only in "at-will" situations, where the parties have not made any express agreement regarding the duration of the relationship. Id. at 380–81, 710 P.2d at 1035–36.

The Wagenseller court rejected, however, the argument that the covenant of good faith and fair dealing that is implied in every contract prevents a "no cause" employment termination. Although "good faith" requires "that neither party do anything that will injure the rights of the other to receive the benefits of their agreement," it "does not create a duty for the employer to terminate the employee only for good cause," nor does it "protect the employee from a 'no-cause' termination." Id. at 383, 710 P.2d at 1038.

We reject CI's argument on appeal that Wagenseller compels us to equate "good cause" with "good faith." The lack of a "good cause" for termination of the distribution agreement is not any evidence that Sysco wrongfully terminated the contract. At the hearing on the motion for summary judgment, CI admitted that it had no other evidence of bad faith or "bad cause" for Sysco's termination:

> THE COURT: You can't show that they terminated for a bad reason such as, well, you have a certain race of people working for you that we don't like or a certain gender or—
>
> [COUNSEL FOR CI]: No.
>
> THE COURT: —some other type of criminal activity. You can't show any bad reason.
>
> [COUNSEL FOR CI]: No, no. All we can show is that Sysco has given us no reason

and has given the court no reason why it['s] done this, that is correct. And I guess our position is that you just can't do that. . . .

Based on *Wagenseller,* as well as the reasoning of the jurisdictions in other states, and absent any evidence of bad faith or violation of public policy in enforcing the termination clause, we conclude that Sysco was entitled to summary judgment in its favor on the wrongful termination claim.

■ CI also argues that summary judgment was inappropriate because a question of fact existed about CI's "reasonable expectation" that the termination clause would not be enforced except for a good cause, such as CI's "bankruptcy or some other unusual factor." CI contends that a reasonable juror could conclude that Sysco's representations induced this expectation, and that a limitation on the right to terminate thus became part of the contract. *See generally Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388 (1984).

In *Darner,* our supreme court held that an insurer could be estopped from enforcing a boilerplate exclusion of coverage that conflicted with the insured's reasonable expectation of coverage. *Id.* at 395–96, 682 P.2d at 400–01. The circumstances under which the expectation arose included the following:

1. The insured's expectation was induced by the words or conduct of the insurer or its agent.
2. The insurer or its agent included the limitation in the contract as a "boilerplate" provision, knowing or having reason to know that the insured would not have agreed to it had the insured known it was there.
3. The insured was unaware of the boilerplate exclusion.
4. The fact finder must find that the insured had no duty to read the policy.

*Id.* at 385–87, 399, 682 P.2d at 390–92, 404. The *Darner* court adopted the "reasonable expectations" principle to "recognize the realities of the insurance business and the methods used in modern insurance practice," and to dispel the fictions that insureds actually "bargain" for the terms of their coverage, are aware of and understand the terms of their coverage, or have any power to eliminate boilerplate provisions in a standardized form. *Id.* at 389, 682 P.2d at 394.

We find this case distinguishable from both *Darner* and *Wagenseller* in many respects. First, this was a negotiated contract with CI represented by counsel. Second, it was entered into during a time when CI was also negotiating with another supplier; thus, CI did not have a complete lack of bargaining power. Third, the record is clear that it contained an explicit no-cause termination provision of which the parties were aware:

THE COURT: Did your client know there was this provision? It did, right?

[COUNSEL FOR CI]: Right. It's in there.

THE COURT: I know what your claim is. You said, don't worry about it. Did they have counsel?

[COUNSEL FOR CI]: Yes.

THE COURT: So, they had counsel and they signed this agreement.

[COUNSEL FOR CI]: Yes.

THE COURT: And they are not unsophisticated business people. You're not claiming that, are you?

[COUNSEL FOR CI]: They are not as sophisticated as Sysco, I'll tell you that.

THE COURT: But—

[COUNSEL FOR CI]: I'm not here to say that they are babes in the woods.

THE COURT: You know, did they attempt to insist on a different clause, denying it saying we don't like this clause; let['s] change it?

[COUNSEL FOR CI]: What they were told is Sysco is not going to exercise that unless you go bankrupt.

THE COURT: Counsel didn't insist let['s] strike it out or change it.

[COUNSEL FOR CI]: I'd say the same thing applies in an oil company situation. That is what the clause says and the oil company has all the bargaining power. Sysco had all the bargaining power here to take it or leave the deal.

THE COURT: It's not an adhesion contract like some of the oil companies might

have to put the pressure on. You're dealing with Kraft anyway. You could have walked off and said, look, Sysco, forget it. You don't want to change this 9(c). We are going over to Kraft.... That's accurate. They could have done that.

[COUNSEL FOR CI]: ... Well, at the very least negotiations were open with Kraft. I'll acknowledge that....

Fourth, the contract contains terms, of which CI admits it was aware, that would be inconsistent with what CI contends was its "reasonable expectation" that termination would not occur except for "good cause." The distribution agreement contains not only the "no cause" termination clause in paragraph 9(c), but it also contains a "good cause" termination clause in paragraph 9(a), which provides for termination by either party with thirty days notice for failure to comply with the agreement. For us to construe the "no cause" clause to mean nothing more than the "good cause" clause would render paragraph 9(c) superfluous. Furthermore, the agreement provides another "good cause" termination provision in paragraph 9(b), upon notice, for material deterioration of CI's financial position. This presumably is the termination clause that would be enforced in the event of CI's bankruptcy, not paragraph 9(c). Because of the inclusion of these two other distinct provisions for "good cause" termination, it would not be reasonable for CI to have "expectations" that paragraph 9(c) would only be enforced for circumstances limited to either its wrongdoing or its bankruptcy. Based on the explicit provisions in the agreement and CI's awareness and understanding of those provisions, therefore, *Darner* would not apply to create a fact issue of CI's reasonable expectations that would preclude summary judgment.

## CONCLUSION

We conclude that, in the absence of a contrary contract provision or statutory regulation, a franchisor's enforcement of a "no-cause" termination clause need not be for "good cause." Bad faith cannot be evidenced in a distribution agreement simply from a "no cause" termination in accordance with the explicit terms of the contract. CI has failed to establish any "reasonable expectation" of an implied requirement of a "good cause" termination under the circumstances of this case. For the foregoing reason, the trial court properly entered summary judgment on the wrongful termination claim.

Neither party has requested attorneys' fees on appeal. Each side shall bear its own fees.

AFFIRMED.

SULT and KLEINSCHMIDT, JJ., concur.